BANKERS' TRUST CO. v. CALHOUN.
(No. 8113.)

(Court of Civil Appeals of Texas. Dallas.
Feb. 15, 1919.   On Motion for Rehear-
ing, March 15, 1919.)

1. LIMITATION OF ACTIONS ☞127(3) — CAN-
CELLATION OF INSTRUMENTS.

Where an original petition was for false and
fraudulent representations which constituted
plaintiff's right to cancel note and recover mon-
ey paid, and the allegations of the amended peti-
tion were in effect the same amplified, there was
no new cause of action, and the amendment re-
lates back to filing original petition so far as
the statute of limitation is concerned.

2. CONTRACTS ☞94(1)—VALIDITY—FRAUD.

Where a contract is induced by material
fraudulent representations, it is void.

3. PRINCIPAL AND AGENT ☞156 — APPAR-
ENT AUTHORITY—FRAUDULENT REPRESENTA-
TIONS.

Where agents acting within the apparent
scope of their authority in selling corporate
stock made a sale by means of false and fraudu-
lent representations, the principal was liable
therefor, whether authorizing such acts or not.

4. EVIDENCE ☞434(8) — CONTRACTS — VA-
RIANCE BY PAROL—FRAUD.

The rule that parol evidence is inadmissible
to vary the terms of a written contract does
not prevent the use of extrinsic evidence to at-
tack its validity by showing fraud in its incep-
tion, notwithstanding the written contract pro-
vides that "no conditions, representations, or
agreements other than these" contained therein
could be considered.

Appeal from District Court, Dallas County;
E. B. Muse, Judge.

Action by Frank A. Calhoun against the
Bankers' Trust Company.   Judgment for
plaintiff, and defendant appeals.   Affirmed.

John W. Pope, of Dallas, for appellant.
Winters, McBroom & Scott, of El Paso, and
Harry P. Lawther, of Dallas, for appellee.

RAINEY, C. J.   Appellee sued the appel-
lant to cancel and hold for naught a certain
note for $9,000 executed by him to the Bank-
ers' Trust Company, and to recover the fur-
ther sum of $2,500 paid by him, which said
sum and note were induced by the false and
fraudulent representations made by one
Murck and one Coleman, duly authorized
agents of appellant.

Appellant answered by general and special
exceptions, general denial, and specially that
the agency of Murck and Coleman was limit-
ed, and not authorized to make the alleged
representations; that the contract signed by
appellee contained no qualifications regard-

ing statements or representations by any one,
but advised appellee in effect the extent of
said agents' authority, etc.

The cause was submitted to a jury on spe-
cial issues, and upon the return of the jury's
answers the court rendered judgment for the
appellee as prayed for, from which this ap-
peal is taken.

The evidence shows that the Bankers'
Trust Company was incorporated under the
laws of Arizona, with an authorized capital
stock of $400,000, with permit to do business
in Texas.   The evidence taken from state-
ments made in appellant's and appellee's
brief, respectively, show:

"In the spring of 1914 the principal office
of the concern was in Dallas, Tex., and W. B.
Slaughter was its president and one of its di-
rectors, G. G. Wright and R. T. Stuart were
also on the board of directors, and Slaughter,
Wright, and Stuart comprised the finance board
and the sales committee.   One Murck and Cole-
man were employed by the Bankers' Trust Com-
pany in the spring of 1914 to sell stock in said
concern.   At that time only $100,000 of the
stock had been paid in, and the $300,000 re-
maining was to be sold as preferred stock.
Slaughter sent these men out to sell stock with
a general letter, 'Just a letter of introduction
letting people know that they had authority to
sell stock, and some personal letters to men that
I know out there.'   Slaughter testified: 'I just
gave them this letter and told them to go out
and sell stock. * * * I don't know whether
the general letter of mine had any limitation of
their authority.   I don't recall the contents of
my letter.   I don't remember whether there was
any restrictions in it or not.'   Appellee Cal-
houn lived at Chloride, N. M.   He was in the live
stock business.   In May, 1914, said Murck and
Coleman came to see him at his ranch in Sierra
county, 15 miles from Chloride, and 40 miles
from the railroad.   They were brought out by
one Bulware, of Silver City, with whom Cal-
houn was acquainted.   They wanted to sell
stock in the appellant company, and showed to
Calhoun the aforesaid general letter from W.
B. Slaughter, constituting them agents to sell
said stock and introducing them as such agents.
Murck did most of the talking.   He stated to
Calhoun that the Bankers' Trust Company was
doing business under the laws of the state of
Texas; that it had paid a dividend of 30½ per
cent. for the two years previous on the stock;
that the book value of the stock (the par value
being $10 per share) was $11.50.   They showed
him a pamphlet containing a statement which
they stated had been prepared by some bank
official of the state of Texas who had examined
the Bankers' Trust Company which corroborat-
ed their representation as to the amount of capi-
tal stock, book value thereof, and the dividends
which had been paid.   They stated the capital
stock to be $500,000, and that, if Calhoun would
buy 1,000 shares at $11.50 per share, he could
pay $1,000 down, and give two notes, one for
$1,500, due in six months, and one for $9,000,
due in one year; that the Bankers' Trust Com-
pany would carry the $9,000 note at 8 per cent.

until such time as the dividends on the stock would pay the note. Induced by the representations of these men, Calhoun bought 1,000 shares of stock, gave them a check for $1,000 and executed his two notes for $1,500 and $9,000, payable in six months and one year, respectively, upon which Murck 'delivered to him the following receipt:

" 'No. 1798. $11,500.00. Chloride, New Mexico, 5—10—1914. Received of F. A. Calhoun the sum of $11,500 in full payment of one thousand shares of the capital stock of the Bankers' Trust Company as per contract the same number as this receipt. Bankers' Trust Company, by W. B. Townsend, Assistant Secretary. Not valid unless countersigned by A. Murck.

" '[Signed]　　　　　　A. Murck.'

"The name A. Murck is written across the face of the receipt over the word 'Countersigned' printed on it. They stated to Calhoun that as soon as the Bankers' Trust Company would receive his check for $1,000 and the notes they would forward to him his stock. This was never done. Murck stated to Calhoun that there 'was no promotion in the stock and they were receiving no commission for selling; said they were working on salary; that the Bankers' Trust Company was paying them a salary to sell this stock.' As a matter of fact, the $1,500 in excess of the par value which Calhoun paid was paid to the sales committee, consisting of W. B. Slaughter, G. G. Wright, and R. T. Stuart, and out of this the sales committee paid to Murck $1,000 commission for effecting the sale of the stock. Slaughter testified: 'They were to get as much cash as they could and get notes the finance board would accept. I don't know about their getting enough to get a commission, but none of it ever came into our office; they would always keep out their commission. The fellow that was handing over the money was paying us as far as he was concerned; he didn't know anything about what we did with the money.' At the same time Calhoun executed the notes and gave his check for $1,000, he signed the certificate for the purchase of the stock:

" 'No. 1092.　　　　Amount, $11,500.00.

" 'This is to certify that I hereby purchase one thousand shares of the capital stock of the Bankers' Trust Company, for which I agree to pay $11,500.00. I further agree that any statement, representation, or agreement of warranty made to me by the person taking this contract shall not in any way operate to cancel or annul this contract, unless the same be reduced to writing and filled in on the following line:

.....................................................

" 'A copy of the certificate of stock is shown on the back hereof, and forms and constitutes a part of this contract as fully as if incorporated in the body hereof.

" 'The further consideration is that I will extend to the Bankers' Trust Company the option of purchase of above-described stock should my stock be for sale.

" 'Dated this 18th day of May, A. D. 1914.

" 'Address:　Chloride, New Mexico.

" '[Signed]　Frank A. Calhoun.

" 'This stock is taken subject to an advance in price.

" 'Witnessed by　　A. Murck, Salesman.'

"On the back of said contract is printed a copy of the said stock certificate, as follows:

" 'No. ——　Preferred Stock.　—— Shares.

" 'Bankers' Trust Company.

" 'This certifies that —— is the owner of —— shares of the preferred stock of the Bankers' Trust Company, transferable only upon the books of the company in person or by attorney on surrender of this certificate properly indorsed. The holder hereof agrees with said Bankers' Trust Company and its stockholders to the following: That the preferred stock of the company is entitled to a cumulative dividend at the rate of 7 per cent. per annum of the par value of said stock, the same to be paid annually on the 1st day of January of each year out of the net earnings of the company; and in case any annual dividend, or any part thereof, is not paid when the same becomes payable, such unpaid amount shall remain a first charge against the net earnings of the company, and be fully paid before the payment of any dividend is made on its common stock. Upon dissolution of the company no part of its assets shall be applied in payment of the common stock, until out of the said assets the par value of the preferred stock shall have been fully paid. The preferred stock shall not have the right to be voted or be represented in any election or stockholders' meeting of the company; all elections and stockholders' meetings to be determined and controlled exclusively by vote of the common stock. When the said annual dividend and 7 per cent. shall have been paid on the preferred stock on the 1st day of January of each year, the common stock shall be entitled to a dividend not to exceed 7 per cent. of the par value of said stock to be paid out of the net earnings of the company remaining after the said payment.

" 'Any further dividends declared out of the net earnings of the company, after first the preferred stock and then the common stock shall have been paid, the 7 per cent. dividends mentioned shall be participated in by both preferred and common stock, share and share alike.

" 'In witness whereof the said —— has caused this certificate to be signed by its president and its corporate seal to be hereto affixed, and attested by its secretary this —— day of ——, 191—.

" '——, President.　——, Secretary.'

"That the said Frank A. Calhoun did, upon the same date and being a part of the same transaction with the above-mentioned stock contract, execute and deliver to the appellant, Bankers' Trust Company, his two certain promissory notes, which are as follows, to wit:

" '$1,500.00　　Chloride, N. M., 5/18/1914.

" 'On or before six months after date for value received, I, we, or either of us promise to pay to the order of the Bankers' Trust Company, one thousand five hundred dollars, at Dallas, Texas, with 7 per cent. interest per annum from date until paid with 10 per cent. as attorney's fees in the event of suit or placement for collection.

" '[Signed] Frank A. Calhoun.

" 'Address:　Chloride, N. M.'

"Marked: 'Paid November 14, 1914.'

"And also the following note:

" '$9,000.00.　No. ——.　Chloride, N. M. 5/18/1914.

" 'One year after date for value received, I, we, or either of us promise to pay to the order of the Bankers' Trust Company nine thousand

dollars, at Dallas, Texas, with 7 per cent. interest per annum from date until paid. And 10 per cent. for attorney's fees in the event of suit or placement for collection.

"[Signed] Frank A. Calhoun.

"Date, ——.

"'Address: Chloride, N. M.'

"For the difference between the contract price to be paid, which was $11,500, and the totals of the above principals of the above two notes in the sum of $10,500, the appellee paid in cash the sum of $1,000, and on November 14, 1914, paid the said $1,500 note as above mentioned, leaving the $9,000 note unpaid, together with interest thereon.

"Calhoun's check for $1,000 was cashed, and he paid the $1,500 note at maturity. When the $9,000 note came due the following May, Calhoun was called upon to pay the same, and was notified that it bore interest at the rate of 10 per cent. after maturity. Calhoun did not pay the note, and then started an investigation, and ascertained that all the statements made to him by Murck and Coleman which induced him to purchase the stock were untrue, and on September 7, 1915, filed the instant suit. He testified that he believed all of said statements, relied upon the same, and would not have bought the stock had he not believed said statements to be true. With reference to the certificate of purchase of stock which he signed Calhoun testified: 'Before I signed it Murck said it was just a matter of form; that it would never be referred to; it was just a matter of -form that he had to go through, and it was not necessary.'

"There were present at this transaction between Calhoun and Murck and Coleman, John James, Harry James, Edward James, and R. H. Bulware. These men all heard what was said at the time, and testified at the trial corroborating Calhoun as to the representations made by Murck and Coleman to induce Calhoun to purchase the stock. Neither Murck nor Coleman testified at trial. The testimony of W. B. Slaughter, president, and R. F. Henderson, secretary, showed that in truth: (1) The concern had not paid dividends averaging 30½ per cent. for the two years previous to 1914, and that, 'if Murck and Coleman told Calhoun that the concern had made for 1912 and 1913 an average of 30½ per cent. on $500,000 capital stock, they were telling what was not true'; (2) that the condition of the Bankers' Trust Company had never been examined by a bank examiner or bank official of the state of Texas; (3) that the book value of the stock in May, 1914, was $1.03 on the stock paid in, and not $1.15 on $500,000 capital stock; (4) that all the proceeds of the sale of stock did not go into the treasury, and that Murck and Coleman were not paid a salary, but that a commission out of the proceeds of each sale of stock was paid to the sales committee composed of Slaughter, Wright, and Stuart, and that this sales committee out of said commission paid Murck and Coleman, the commission on this particular sale amounting to $1,500, out of which Murck and Coleman got $1,000; (5) that Calhoun's certificate of stock was not sent to him upon the receipt in Dallas of his notes and a certificate of purchase, and was never intended to be so sent him, and that his note for $9,000 was not carried by the Bankers' Trust Company at 8 per cent. until the same was paid out of the dividends upon Calhoun's stock, and was never intended to be so carried and paid; (6) the charter of the concern showed that the authorized capital stock was $400,000, not $500,-000, in May, 1914. The amendment increasing the capital stock to $800,000 was not filed in Arizona until June 29, 1914, nor in Texas until the 6th day of July, 1914. The application to sell the additional stock authorized by the amendment under the Texas Blue Sky Law was not approved until August 19, 1914. Ed James testified that among the other yarns told by Murck and Coleman as an inducement to get Calhoun to buy the stock was that a purchaser of same was protected by the Texas Blue Sky Law."

## Opinion.

[1] Appellant complains that the court erred in not rendering judgment for it on the ground of two years' limitation, for the reason that plaintiff filed his original petition September, 1915, but did not file his amended petition until November 20, 1917, setting up fraud and deceit, which was a new cause of action. The contention is that—

"Whenever a cause of action is based upon deceit or fraud of another, the cause of action thereon accrues at the time the deceit or fraud is discovered, or when it should have been discovered by the use of ordinary diligence on the part of the one damaged, and limitation begins to run against such cause of action at that time, and the two-year statute of limitation applies to such action."

The basis of the original petition was false and fraudulent representations which constituted appellee's right of recovery, and the allegations of the amended petition were in effect the same, but only amplified said false and fraudulent representations; therefore no new cause of action was set up by said amendment, as the same relates back to the time of filing the original petition.

[2, 3] Appellant's second assignment of error complains of the court's action in not rendering judgment for appellant, as it is contrary to the finding of the jury in eight particulars, and presented in its motion for a new trial, and is thus stated:

"The court erred in rendering judgment for the plaintiff, because the jury found that Murck or Coleman did not have authority to make the representations set out in special issue No. 1 requested by the plaintiff."

The other issues referred to are Nos. 4, 7, 10, 13, 16, 19, and 23, which are couched in similar language as the one quoted, except the number. The jury did not make the answer as stated by appellant, that Murck and Coleman did not have authority from appellant to make the false representations as stated. But the jury did find that all of said representations were made by Murck and Coleman, and that they were false; that Calhoun believed the same, and was induced

by same to sign the contract, and it makes no difference, as they did make said representations, whether they had authority from the trust company to so make them or not, and this brings us to the main issue for solution; that is, conceding that Murck and Coleman had no authority to make said false representations, but having made them, and appellee having believed and acted upon them, did he have the right of action? It is well settled in this state, that, where a contract is induced by material fraudulent representations, such vitiates the contract and it becomes void. This rule applies to the principal parties to a contract, and is there any reason why it does not apply to contracts made where either party is represented by an agent? We do not see any difference; for a principal is bound by the acts of an agent when done within the scope of his authority. The general rule is:

"Where an agent in negotiating a transaction or making a contract on behalf of his principal makes representations, declarations and admissions in connection therewith respecting the subject-matter, they will be binding on the principal, where they are made at the time, and as a part of, the transaction, and although they are false and fraudulent, made without the knowledge or authority of the principal, and even though contrary to the instructions of the principal, and constitute a breach of trust against the principal." Corpus Juris, vol. 2, § 541, p. 956; 21 Ruling Case Law, § 25, p. 844, and section 30, p. 850.

This is the rule in Texas. McAlpin v. Cassidy, 17 Tex. 450; Collins v. Cooper, 65 Tex. 460.

Murck and Coleman were sent out by appellant to sell stock, and were empowered to make representations in relation thereto, and to bind the appellant.

The jury found in answer to special issues that the representations as charged were made by Murck and Coleman as agents of appellant; that said representations were false; that Calhoun believed them, and he was induced thereby to make said contract, and it matters not that appellant did not authorize such representations. Said agents were acting within the apparent scope of their authority, and Calhoun was justified in acting on their representations. Cases in point are Case v. Webb, 181 S. W. 853; Kirby v. Thurmond, 152 S. W. 1099; Gypsum Co. v. Shield, 106 S. W. 724, affirmed by Supreme Court, 101 Tex. 478, 108 S. W. 1165; Jones v. Trust Co. (D. C.) 239 Fed. 771; Tiffany v. Automobile Co., 168 Mo. App. 729, 154 S. W. 865.

[4] The writer can do no better than quote from Gypsum Co. v. Shields, supra. The language of Justice Neill on the question of admitting parol testimony in such a case as this is:

"It is contended, under these assignments, that it was error to admit such testimony, because: (1) It was immaterial and irrelevant, in that the representations testified to were made prior to signing the contract, and therefore merged in the writing; (2) the testimony was an attempt to change or vary the terms of a written contract, which could not be done by parol evidence; and (3) the contract upon its face bears the following stipulation: 'It is agreed that this written order and printed terms hereon constitute the entire contract between the parties, and there are no verbal statements or agreements varying the same.' These assignments are followed in appellant's brief by propositions of law so elementary that no one can gainsay any of them. The gist of them is that parol evidence is inadmissible to vary the terms of a written contract. This rule, however, has no application to extrinsic evidence, when used to attack the validity of a contract, as, in this case, by showing fraud in its inception. If a party were denied the right to show facts which prevent a writing from constituting a contract, such a writing would be free from all defenses, and outside of all rules which determine the validity of contracts. Parsons on Contracts (9th Ed.) 708; Barrie v. Miller, 104 Ga. 312, 30 S. E. 840, 69 Am. St. Rep. 171; Howie v. Platt, 83 Miss. 15, 35 South. 216. The evidence objected to was not introduced for the purpose of varying the terms of the writing sued upon, which it did not tend to do, but to the end of showing that defendant was induced to sign the paper by the fraudulent representations of the plaintiff. On this issue it was clearly admissible."

Appellant relies on the case of Bonding & Casualty Ins. Co. v. Barrington, 180 S. W. 936, which we think holds contrary to the principles cited above, but in it is an admission which shows it to be dissimilar to the facts in this case, wherein it states:

"The petition in this case does not seek to reform the contract on the ground of fraud or allege that, as drawn, it was not the contract agreed upon, but only that it was procured through fraudulent representations which induced appellee to sign it. It is insisted by appellant that appellee should not have been permitted to prove any other agreement or promise than those contained in the contract itself for the reason that the recitals in the contract that there were 'no conditions, representations, or agreements other than these' contained therein. We were first inclined to believe the proposition presented by appellant to be sound, but under the authority of U. S. Gypsum Co. v. Shields, 106 S. W. 725, and affirmed by the Supreme Court, 101 Tex. 473, 108 S. W. 1165, in which a like provision was contained in an order, in which it was held such provision did not preclude proof of fraudulent representations inducing the contract, and that such proof did not vary the terms of the contract. This case induces us to conclude otherwise. We might note, however, that the grounds set up to avoid the contract in that case were facts outside the contract. and did not purport to be part of the promise or agreement, but were only representations that certain contractors would use the material being sold in the construction of

government buildings; and it further appears that the cement ordered by the dealer was for the purpose of sale, and in that particular that case is distinguishable from this."

We have considered all other assignments not here discussed, but find no reversible error in any of them.

We are convinced that justice has been reached, and the judgment of the court below is affirmed.

Affirmed.

On Motion for Rehearing.

Appellant complains that it was stated in the opinion that "the jury found that the agents Murck and Coleman were authorized to make the representations they made to Calhoun as charged." The writer confesses to have erred in so stating. The jury found that said agents were not authorized to make such representations, but such representations were made and relied on by Calhoun; but said error does not alter the former holding, as the rule of law as far as Calhoun is concerned is the same.

The motion for rehearing is overruled.