**WALTER E. HELLER & COMPANY,**
Appellant-Appellee,

v.

**James C. BARNES, Sr., et al., Appellees-Appellants.**

**No. 5783.**

Court of Civil Appeals of Texas.

El Paso.

Feb. 22, 1967.

Rehearing Denied March 22, 1967.

Strasburger, Price, Kelton, Miller & Martin, Royal H. Brin, Jr., Dallas, for appellant and appellee.

Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., and Milton L. Bankston, Midland, for Barnes and others.

Allan Poage, El Paso, Wm. J. Rochelle, Jr., and John L. King, Dallas, for intervenor.

G. H. Nelson, Lubbock, for McSpadden.

Walker F. Means, Pecos, for appellees and appellants.

## OPINION

CLAYTON, Justice.

This may be characterized as a "Billie Sol Estes" case. The facts in brief essence are these:

Estes would arrange with a manufacturer of anhydrous ammonia tanks and related equipment, such as, in this case, Superior Manufacturing Company, hereafter referred to as "Superior", to sell it certain tanks which he claimed he then owned, and further, that he would secure "purchasers" who would buy tanks from the manufacturer. Estes promised the manufacturer that the purchases would be arranged under a price which would allow the manufacturer a profit equal to its normal profit had it indeed manufactured the tanks. Estes (or his agents) would agree with the purchasers that if they entered into his proposed transaction he would pay the down payment, if required by the manufacturer, and pay them a cash "bonus" amounting to approximately ten per cent of the purchase price of the tanks, and further, would lease the tanks from the purchaser on the basis of rentals that would amount to the installments on the unpaid portion of the purchase price of the tanks due the manufacturer. Estes would then secure from the purchasers the lease agreements, chattel mortgages or conditional sales contracts and installment notes on the tanks to be "purchased", together with balance sheets and credit ratings and financial statements of the purchasers, and would execute his lease of the tanks and make the"bonus" payments. The necessary papers were then turned over to the manufacturer, who, through its agents, would pass the required papers over to finance companies, or individuals, such as Walter E. Heller & Company, in this case, who would discount the paper and pay the manu-

facturer. The latter would recieve the "mark up" or profit, and pass the balance along to Estes, from which he would make his rental payments, the "bonus", etc., and continue the cycle, although the tanks, in large measure, were never manufactured. Elaborate arrangements were made to avoid detection, such as dummy number plates to be attached to tanks in existence that would conform to numbers contained in the purchase documents, in the event of possible inspection.

When these Estes schemes became disclosed, this suit was filed by plaintiffs, included in what may be known as the "Barnes Group": i. e., J. C. Barnes, Sr., J. C. Barnes, Jr., Russell J. Ramsland and W. F. Wynn, one of the many groups or associations of purchasers, against Billie Sol Estes, individually and d/b/a Billie Sol Estes Enterprises or Billie Sol Estes Enterprises, Inc., Superior Manufacturing Company, Barbara Jean Orr, Executrix of the Estate of Harold E. Orr, deceased, Coleman D. McSpadden, who, with Orr, was a former officer of Superior, and Walter E. Heller & Company, one of the finance groups. Other original parties defendant were severed and were disposed of in other suits. This cause of action was for damages and for the cancellation of certain obligations executed by the Barnes Group and held by, among others, Heller & Company. During the proceedings in the trial on its merits, the Barnes Group tendered and paid into the registry of the court, the sum of $81,299.52, as representing the "bonus" payments it had received from Estes for signing some or all of the instruments it sought to cancel. Harry Moore, Jr., Trustee of the bankrupt estate of Billie Sol Estes, intervened in the trial to recover for the estate the tendered amount on the contention that these bonus payments were made from Estes' general bank account and could not be traced to the money that came from Heller through Superior to Estes or to any other specific source, and therefore should be returned to the bankrupt estate for the benefit of all of Estes' creditors, including the plaintiffs and defendants in this case.

Walter E. Heller & Company, the only defendant in the suit to contest the same, denied the allegations of plaintiffs that it had entered into a fraudulent conspiracy in the transactions in question, and filed a cross-action against the Barnes Group, seeking judgment for the unpaid balance of the notes signed by the latter, thus becoming a cross-plaintiff.

Trial was to a jury, to which was submitted twenty-six special issues, which issues, and the jury's answers thereto, are as follows:

No. 1. That Walter E. Heller & Company acted in bad faith in taking the Barnes Group instruments involved in this suit. (The court defined "bad faith" as follows: "You are instructed that the term 'bad faith', as used in this charge, means that the persons or company making or taking the instrument must have knowledge of substantial facts and circumstances as to create in his or its mind a suspicion that there was something wrong with the subject matter or title of the persons or person for whom he makes it or from whom he or it takes it, the instrument itself, or to the money represented by such instrument, combined with an intentional disregard of and refusal on the part of the maker or taker of the instrument to learn the facts from the means of knowledge which he or it knows or is at hand, and the circumstances must be such as to constitute dishonesty and not merely negligence.")

No. 2. That the Barnes Group acted in bad faith in signing and executing the instruments.

No. 3. That Heller & Company participated in a conspiracy with Estes or Superior to conceal the non-existence of the anhydrous ammonia tanks from the Barnes Group at the time of the execution of the instruments.

No. 4. That Estes, Orr and Superior did not conspire to conceal the non-existence of

the tanks and equipment from Heller at the time of its purchase of the instruments.

No. 5. That Robert K. Graham did not participate in the conspiracy mentioned in No. 4 above. (Robert K. Graham was an officer in Leasing, Inc., and General Leasing of Ft. Wayne, Inc., Indiana corporations, the name of one or the other of such corporations and that of Graham appearing in most, if not all of the lease contracts which were assigned to Heller and others. Graham had represented himself as an "agent" of Heller, and was described in the testimony as being in liaison with Estes and Superior.)

No. 6. That Estes represented that the tanks and equipment described in the instruments were in existence at the time the instruments were obtained from the Barnes Group.

No. 6A. That such representation was false.

No. 7. That the Barnes Group believed and relied upon such representation.

No. 8. That the Barnes Group would not have signed such instruments had such representation not been made.

No. 9. That Robert K. Graham represented that the tanks and equipment described in the instruments were in existence at the time the instruments were obtained from the Barnes Group.

No. 9A. That such representation was false.

No. 10. That the Barnes Group believed and relied upon such representation.

No. 11. That the Barnes Group would not have signed the instruments had such representation not been made.

No. 12. That the Barnes Group represented to Heller & Company that the tanks and equipment had been furnished and delivered by the supplier and accepted by the Barnes Group.

No. 13. That at the time of such representation the Barnes Group knew that the tanks and equipment had not been furnished and delivered by the supplier and accepted by the Barnes Group.

No. 14. That the Barnes Group intended such representation to be relied upon by some financial or lending institutions such as Heller & Company.

No. 15. That Heller & Company did not believe or rely upon such representations.

No. 16. This issue is conditioned upon an affirmative answer to Special Issue No. 15, and was not answered since the answer to Special Issue No. 15 was in the negative.

No. 17. That Robert K. Graham was an agent of Heller & Company at the time and on the occasion when the instruments were obtained from the Barnes Group. (The court gave a definition of "agent" and "apparent" or "ostensible" agent.)

No. 18. That the endorsements on the back of the notes involved in this suit were not changed or altered as to the number of parties to the instruments after endorsement by Superior.

No. 19. The notes and chattel mortgages involved in this suit provided for interest exceeding ten per cent per annum. (The court gave a definition of "interest".)

No. 20. That $72,000.00 would be a reasonable attorneys' fee for the legal services incurred by Heller & Company in this cause.

No. 21. The jury answered "None" to the issue of what sum of money, if paid in cash now, would fairly and reasonably compensate the Barnes Group for their damages proximately caused by the acts and conduct of Heller & Company complained of by the Barnes Group, such as is indicated in Issues 1 and 3. (The court gave an instruction that the burden was upon the plaintiff to establish that it had sustained damages proximately caused by the complained-of acts and conduct of Heller & Company.)

No. 22. Left unanswered since it was conditioned upon an affirmative answer to Issues 6, 6A, 7, 8, 9, 9A, 10 and 11, and some amount of money in answer to Special Issue 21, since no amount of money was found in answer to Special Issue 21. This issue was relative to "malice" as defined in the issue.

No. 23. This issue was also left unanswered since it was conditioned upon affirmative answer to Special Issue No. 3, and to some amount of money found in Special Issue No. 21. This issue has to do with "malice" as defined in the issue.

No. 24. This issue is relative to "punitive or exemplary damages" as defined in the issue, to be assessed against Heller & Company and was left unanswered since it was conditioned upon affirmative answers to Special Issues Nos. 22 and 23.

 We feel it fair to state at the outset, without a detailed review, that in the mass of testimony (over 3,000 pages) and exhibits (five volumes) contained in the record in this case there was competent testimony and evidence of probative force to support the jury's answers to all the special issues submitted to it and that their answers cannot be said to be against the great weight and preponderance of the competent evidence. In passing on all assignments of error relating to the existence or sufficiency of the evidence to support jury findings, we have followed the familiar rules for appellate determination of such assignments, to-wit: Where the assignment is that there is "no evidence", the reviewing court considers only the evidence favorable to the finding and must sustain the finding if there is evidence of probative force to support it. Hartford Accident & Indemnity Company v. Gant, 346 S.W.2d 359 (Tex.Civ.App., n. w. h.); Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (S.Ct., 1914). In determining "insufficiency of the evidence" or "contrary to the great weight and preponderance" points, we must consider and weigh all the evidence in the case, and set aside the verdict and remand for a new trial if we conclude that the verdict or finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (S.Ct., 1952).

Plaintiffs, defendant and cross-plaintiff, Heller & Company, and the Intervenor all made motions for judgment. The court recited in its judgment that: "all parties herein participated, as a matter of law, in a conspiracy of fraud and are not entitled to any relief in equity or law or to be in position to invoke the relief of the judiciary in any manner", and entered judgment denying the motions of all parties for judgment and denying all parties the relief sought and decreeing that "no party make any recovery against any other party"; and as to the funds tendered and paid in to the Registry of the Court, "that no party hereto recover such funds or any part thereof", to which all parties duly excepted and gave notice of appeal. Therefore, although this case has come up to us under the style as shown on this opinion, or variations thereof, all parties are, in fact, both appellants and appellees. However, since the effect of this judgment was to grant the Barnes Group relief from their obligations held by Heller & Company, and for the sake of simplicity, the style of the case will remain as shown in this opinion. The "bonus" money tendered and paid into the Registry of the Court is now held in the account of the Registry Trust Fund in the First National Bank of Pecos, Texas.

 The Heller Company presents twenty-seven points of error in its appeal. The First, Second and Third Points, for convenience, can be grouped together. The First Point alleges error in denying Heller recovery upon the notes it sued upon, and in effect cancelling them, and (in the Second Point), in giving effect to the defenses of fraud, failure of consideration and the like, asserted by the Barnes Group, in view of answers to Special Issues 2, 12, 13 and 14; and the Third Point asserting that estoppel by contractual provisions prevented the Barnes Group from asserting the defenses

relied upon by them. The Barnes Group replied to the first two points by its Counterpoint No. 1, asserting that the court did not err in failing to grant affirmative relief to Heller. The Barnes Group, in its prayer for relief, asked the court to cancel all instruments it had executed, such as notes, chattel mortgages, equipment, leases, etc. pleaded by Heller and attached to its cross-action, and requiring all such instruments to be surrendered to plaintiffs. Heller asserts that rescission or cancellation is an equitable remedy, and cites cases and text authorities in support of this principle. Heller then follows with the well-known maxim that "He who comes into equity must come with clean hands" and points to the jury's answers to Issues 2, 12, 13 and 14 as disqualifying the Barnes Group, both as to affirmative relief in its lawsuit and as to a defense to the Heller cross-action on the grounds of fraud, failure of consideration and the like. The Heller complaint is that while the trial court did not expressly decree rescission or cancellation, it did grant cancellation of the Barnes notes in effect by relieving the Barnes Group of any liability and denying Heller recovery on them. But, on the other hand, it must be borne in mind that the jury, in answer to Special Issue No. 1, found that Heller acted in bad faith, as defined by the court, in taking the Barnes Group instruments involved in this suit. The court's definition of "bad faith" follows closely the definition of bad faith given in Fenner v. American Surety Co. of New York, 156 S.W.2d 279, 282 (Tex.Civ.App., 1941; err. ref., w. o. m.) and approved by the Texas Supreme Court in Citizens Bridge Co. v. Guerra, 152 Tex. 361, 258 S.W.2d 64, 70, and that this is normally a question of fact. To allow Heller to recover on the instruments in question would, under the circumstances, allow it to benefit from its own misconduct and dishonesty, as found by the jury, even though the Barnes Group would not be entitled to rescission or cancellation of the instruments. Heller cannot place itself in the position of an "innocent person" under the principle of estoppel asserted by it "that when one of two innocent persons must suffer, the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong."

The "contractual provisions" asserted by Heller which it claims gave rise to estoppel against the Barnes Group were written representations by the latter that the tanks were in existence and had been delivered to the latter, contained in mortgage contracts, delivery certificates, etc. Heller relies on Crutchfield v. Associates Investment Company, 376 S.W.2d 957 (Tex.Civ.App., 1964; err. ref.), where the court gave a summary judgment to the appellee who was in a somewhat similar position to Heller here, and held that appellant was estopped by like contractual provisions as we have here, and that if the appellant there had any right of redress it was against Superior Manufacturing Company. However, as pointed out by Barnes in their brief, although the jury here found in Special Issues 12, 13 and 14 that Barnes was guilty of misrepresentations intended to be relied upon by a similar institution to Heller, the latter did not believe or rely upon them, but instead (Special Issue 3) was a party to the conspiracy and therefore could not benefit from the principle of estoppel since it had actual knowledge of the non-existence of the equipment. Appellant's First, Second and Third Points are overruled.

The Fourth and Thirteenth Points assert error in failing to render judgment N.O.V. the jury's answers to Special Issues 1, 3, 9, 9A, 10, 11, 15 and 17 because of no competent evidence of probative force to support them, or insufficient evidence and against the great weight and preponderance of the competent evidence. Here again we state, as we did earlier in this opinion, that there is to be found in this record sufficient competent evidence to support the answers of the jury to all the special issues submitted to it. In these points Heller selects all the issues answered adversely to it and to Robert K. Graham, found to be its agent. Some of these issues will be touched upon later

in this opinion. The Fourth and Thirteenth Points of Error are overruled.

What has been said applies to the substance, if not the wording, of the Fifth Point, that there is no competent evidence of probative force that Heller took part in a conspiracy to defraud itself, nor that it knowingly paid out great sums of money for the purchase of fraudulent notes upon non-existent tanks. There is no special issue that asked, or any answer that found, that Heller had engaged in a conspiracy to defraud *itself,* but while this point is at this time overruled, we presume that it is related to Special Issues Nos. 9 and 17, that Robert K. Graham was an agent of Heller & Company at the time and on the occasion when the instruments were obtained from the Barnes Group, and that at such time Graham had represented that the tanks and equipment described in the instruments were in existence. This matter will be touched upon now under the Sixth and Seventh Points of Error.

The Sixth Point of Error states that as a matter of law under this record Graham was not an agent of Heller, and that his knowledge, statements and conduct are not chargeable to it. The jury, having before it the court's definition of "agent" and "apparent" or "ostensible" agent, found that Graham was an agent of Heller, as stated above, and probably based this answer in part upon the testimony and evidence that Graham had the Heller papers that were executed by the Barnes Group and given back to Graham and were delivered to Heller, and apparently received for delivery, the Heller money on the Barnes' papers. This is further borne out by a memorandum of January 8, 1962 from H. Krieger, Jr., to Mr. Sid Bloom, both of the Heller Company, relative to "new documentation" in the Barnes deal, which had been sent to Graham, who was to try to "get same signed". If the jury's finding of agency was correct, then the Seventh Point of Error becomes pertinent here. It asserts that the record establishes as a matter of law that there was such adverse interest on the part of Graham as to preclude Heller from being charged with his knowledge, statements and conduct. Heller's brief cites numerous authorities for the proposition, set out in Binder v. Millikin, 201 S.W. 239, 241–242 (Tex.Civ.App., 1918; err. ref.) that:

"The law abhors double dealing, especially upon the part of one in whom a trust is reposed and confidence given; and when the agent turns aside from the plain paths of his agency and seeks individual advantage inconsistent with, and antagonistic to, the rights and interests of his principal, his authority is automatically destroyed and agency revoked. He cannot be permitted to hold a position where self-interest and honor become contending forces, and where dire temptations would assail and ordinarily conquer him."

But there is also impressive authority for the holding in Bankers' Trust Co. v. Calhoun, 209 S.W. 826, 829 (Tex.Civ.App., 1919; err. ref.) as follows:

" * * * The general rule is:

" 'Where an agent in negotiating a transaction or making a contract on behalf of his principal makes representations, declarations and admissions in connection therewith respecting the subject-matter, they will be binding on the principal, where they are made at the time, and as a part of, the transaction, and although they are false and fraudulent, made without the knowledge or authority of the principal, and even though contrary to the instructions of the principal, and constitute a breach of trust against the principal.' Corpus Juris, vol. 2, § 541, p. 956; 21 Ruling Case Law, § 25, p. 844, and section 30, p. 850.

"This is the rule in Texas."

This holding was approved in National Bankers Life Ins. Co. v. Watson, 266 S.W. 2d 420, 423 (Tex.Civ.App., 1953; n. w. h.) which described the Calhoun case as "often thereafter cited with approval". We cannot

say as a matter of law that Heller was precluded from being charged with Graham's knowledge, statements and conduct, in view of this record, and we overrule the Sixth and Seventh Points of Error.

Related to these points are the following Points of Error: Eighth, that there is no evidence of any representation by Graham to the Barnes Group that the tanks were in existence nor any reliance by them upon such a representation by him; Fourteenth, complaining of improper admission of hearsay declarations of Graham and others to establish agency and on other matters; Sixteenth, that the court should not have overruled Heller's objection to the definition of agency in Special Issue No. 17 which stated that agency may be implied from the words and conduct "of the parties" when under the law it can be implied only from words and conduct of the alleged principal and not the alleged agent; Seventeenth, that the court erred in overruling Heller's objection to Special Issue No. 17 in the foregoing respect; and Eighteenth, that the court improperly and over objection admitted a copy of a letter purportedly from one R. W. Alexander of Superior, to Graham at Heller's address, as involving at most a conclusion of Alexander.

■ Relative to the Eighth Point, the jury found in answer to Special Issue Nos. 9, 9A, 10 and 11 that Graham represented that the tanks and equipment described in the Barnes instruments were in existence when such instruments were obtained, that these representations were false, but were believed and relied upon by the Barnes Group who would not have executed such instruments had not these representations been made. Again we assert that there was ample justification in the record for such jury findings. Under the Fourteenth Point, we feel that certain hearsay testimony and conclusions were admitted by the trial court, but we further feel that there was ample admissible testimony under the court's charge and instructions as to the meaning of

the words "apparent" and "ostensible" agent for the jury to find agency in Graham. The court's definitions followed the definitions contained in Collins v. San Antonio Food Products & Produce Co., 188 S.W.2d 888 (Tex.Civ.App., 1945; err. dism.) which were followed by this court in Gibbins, Inc. v. McMillan, 383 S.W.2d 94 (Tex.Civ.App., 1964; err. ref. n. r. e.). These cases hold that "apparent agent" or "ostensible agent" is one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, though he has not, either expressly or by implication, conferred authority on him. This court continued: "Thus, it is based on estoppel, and it must come from representations or acts of the principal", citing Minneapolis-Moline Co. v. Purser, 361 S.W.2d 239 (Tex.Civ.App., err. ref., n. r. e.); 2 Tex.Jur.2d, pp. 484–485. This matter was treated at greater length under our discussion of the Sixth Point of Error. Under the Sixteenth and Seventeenth Points of Error, we believe that the trial court should have sustained the objection of Heller to the court's explanation of the "relation of agency" in Special Issue No. 17, but we are of the opinion that its failure to do so does not constitute reversible error, especially since there was evidence to support a finding under the definitions of "apparent" and "ostensible" agency. Thus we believe that this case is distinguishable on the facts from the State Amusement Co. v. Turrentine & Thompson, Tex.Civ.App., 21 S.W.2d 344 case, cited by appellant, since in the latter case the agent's statements alone were relied upon to show agency. But that case *does* say, "Where there is evidence aliunde from which a jury could find agency, the declarations of the agent, made during the agency, in regard to the transaction connected therewith, are admissible as to the declarations of the principal, but not to prove agency." As to the Eighteenth Point of Error, we think the objection of Heller that the letter from R. W. Alexander of Superior addressed to Graham at the Heller address, constituted a mere conclusion on the part of Alexander is a valid

objection, and the letter should have been excluded. But here again, since the letter was not admitted for the truth of its contents, but as further evidence of agency, we believe under the circumstances its admission was harmless error. We overrule the Eighth, Fourteenth, Sixteenth, Seventeenth and Eighteenth Points of Error.

We propose to discuss the Ninth, Tenth, Eleventh, Twelfth and Fifteenth Points of Error together. The Ninth Point asserts that there is "no competent evidence of probative force" in the record that Hilbert. Kreeger, of Heller, had knowledge of the non-existence of the tanks, or (Tenth) if he did, he was acting adversely to Heller so that his knowledge would not be imputed to it. The Eleventh Point charges error of the trial court in denying Heller's amended motion for new trial on the basis of newly discovered evidence, and in the Twelfth Point, that jury argument by the Barnes Group's counsel that one Lutich had told his attorney, Feuille, that there were no tanks and that Feuille told Kreeger, was knowingly false, improper and prejudicial and constituted reversible error. To begin with, there was no specific finding by the jury that Hilbert Kreeger had knowledge of the non-existence of the tanks, since there was no issue submitted to the jury on this precise matter, although a presumption of knowledge might have been derived from the testimony. But the Ninth Point must be overruled, and therefore the Tenth Point requires no discussion. The Eleventh Point relates to the execution by one Lutich of El Paso County of instruments relative to anhydrous ammonia tanks and equipment, and a subsequent telephone call by Lutich's attorney, Feuille, presumably to Hilbert Kreeger, in which Feuille asked for the return of the instruments Lutich had signed. Lutich had stated that he (Lutich) first learned of the non-existence of the tanks when Feuille had told him, but Feuille, in his deposition, denies that he had told this to Lutich or to Kreeger, but merely told Kreeger that Lutich had not received any tanks and was not expected to receive any, and that therefore there was no consideration for the instruments and that he, Feuille, considered the whole transaction as a bogus, fraudulent transaction, and that he wanted Lutich's papers returned to him. There is here at least a strong presumption that the man Feuille talked to was Kreeger, since the call was meant for Kreeger, and the man who answered it said he was Kreeger and that the Lutich papers had been received and were on his desk, but Heller would not buy them, and while he could not send them directly to Feuille, that they would be returned to the source from which he had gotten them, and they were actually returned to Lutich with a transmittal letter from Estes. But be that as it may, there was not such a conflict between Lutich's testimony and Feuille's deposition as to warrant a new trial on the basis of newly discovered evidence, since it was such evidence as could have been adduced from Feuille at the time of the trial; nor do we feel that argument of Barnes' counsel as set out in the Twelfth Point was so highly prejudicial as to constitute reversible error. Consequently, we overrule the Ninth, Tenth, Eleventh and Twelfth Points. The Fifteenth Point again refers to agency and Heller's requested instruction as to Special Issues 1, 3 and 17 on the matter of agency and scope of agency and the imputation of acts and knowledge of the alleged agent to his principal. We feel that this matter has been sufficiently treated before in this opinion, and again refer to the holding in Bankers' Trust Co. v. Calhoun, Tex.Civ. App., 209 S.W. 826 as being determinative of this point of error, which we overrule.

We now turn our attention to the Nineteenth, Twentieth, Twenty-first, Twenty-second, Twenty-third and Twenty-fourth Points of Error, all relative to alleged error of the trial court in admitting or excluding testimony, which points will be discussed together. The Nineteenth Point complained of the admission against Heller of evidence of forgery by others of papers in transactions other than those in-

volved in this suit, and in the Twentieth, conduct and statements of employees of Pacific Finance Company, not a party to this suit; and in Twenty-first, statements and conduct of alleged co-conspirators in the absence of independent evidence establishing participation by Heller in the claimed conspiracy. The Twenty-second attacks the admission of evidence concerning a meeting of finance company representatives in Dallas in 1962, after the non-existence of the tanks had come to light, the complaint being that such evidence was immaterial, irrelevant and prejudicial, as well as that the evidence constituted privileged efforts toward settlement. The Twenty-third Point related to the prejudicial injection of claims of usury and the Twenty-fourth objects to the exclusion of testimony that at the Lubbock meeting and elsewhere neither Bloom nor Greenberg of Heller indicated that they had known all along that the tanks did not exist or that Estes was involved. As to the first four of the points mentioned above, we conceive them to be related to the conspiracy in which Heller (and Graham) participated, as found by the jury in answers to Special Issues Nos. 3, 9, 9A, 10 and 11, and are governed by the law governing conspiracies as a whole. This is set out clearly in Vittitoe v. Junkin, 54 S.W.2d 166, 167 (Tex.Civ. App., 1932; err. dism.) as follows:

> " 'It is a well-settled rule of evidence that, when the testimony establishes a conspiracy, the acts and declarations of a co-conspirator made in furtherance of the common design, are admissible against all of the conspirators. "The principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evidence against the person prosecuted, is that, by the act of conspiring together, the conspirators have jointly assumed to themselves as a body the attribute of individuality so far as regards the prosecution of the common design; thus rendering whatever is done or said in furtherance of that design a

part of the res gestae, and therefore the act of all." 3 Greenl.Ev. § 94.' "

The order of the proof is not very material, Daggett v. Farmers' Nat. Bank, 259 S.W. 198, 202 (Tex.Civ.App., 1924), affirmed 2 S.W.2d 834 (Com.App., 1928): " * * * The order of proof is not very material; it being discretionary with the court to admit proof of declarations before proof of conspiracy." That a conspiracy was proved is shown by the jury's answers. The testimony complained of, therefore, became admissible, and Points Nineteen, Twenty, Twenty-one and Twenty-two are overruled. As to the Twenty-third Point, the matter of usury was developed in the case, and an issue, No. 19, was submitted to the jury which found that in the notes and chattel mortgages involved in the case, provision was made for interest exceeding the legal limit of ten per cent per annum. Mr. Sidney Bloom, of Heller, himself testified that the finance charge of the Heller notes figured 10.8 per cent per annum. A correct definition of "interest" was given in the court's charge: " * * * compensation allowed by law or fixed by the parties to a contract for the use, forbearance or detention of money." National Bond & Investment Co. v. Atkinson, 254 S.W.2d 885 (Tex.Civ.App., 1952; err. dism.); Art. 5074a, Texas Rev.Civil St. The Twenty-third Point is overruled.

The Twenty-fourth Point charges error of the court in excluding evidence that neither Bloom nor Greenberg, of Heller, stated or indicated that they had known that the tanks did not exist or that Estes was involved. Actually, any such statements by the parties involved would have been self-serving and should have been excluded, whatever the statements involved. This point presents no error, and the point is overruled.

Heller then concludes its specific points of error with the Twenty-fifth, stating that the cumulative effect of the many errors herein, prejudicial to Heller, requires reversal. From what has been stated be-

fore, we have found no "many errors" on which a "cumulative effect" may arise, and overrule this point.

The Twenty-sixth point complains of the failure of the court to grant an instructed verdict as to the cross-defendants other than the Barnes Group. The record fails to reveal that the cross-defendants other than the Barnes Group were ever served with citation of Heller's cross-action, nor did they appear in person or by counsel to contest this matter. We therefore conclude that these cross-defendants other than the Barnes Group were not before the court as to Heller's cross-action, and we therefore overrule this Twenty-sixth Point.

 In the Twenty-seventh Point Heller asserts error in retaining the tendered funds in the registry of the court and failing to award them to Heller. This is really two points, the first of which—retaining these funds in the registry of the court—we modify; but the second—failing to award them to Heller—we overrule. We believe these funds should have been awarded to Harry Moore, Jr., the Trustee of the Bankrupt, Estes. He was instructed to, and did intervene in this cause, by authority of the United States District Court for the Western District of Texas, to recover these "bonus" payments from Estes to the Barnes Group. We are persuaded that the Trustee is not in a position, as described by Heller, as "standing in the shoes of Estes", and involving an "unjust enrichment" at the expense of Heller, while Heller was entitled to a "constructive trust" as to these funds. Under the findings of the jury, neither the Barnes Group nor Heller would be legally or equitably entitled to these funds. As to the Barnes Group, the Intervenor has cited us to various authorities, which, like 10 C.J.S. (1938 Ed.) Bills and Notes § 483, p. 1047, holds:

> "Where a party seeks to defend on the ground of fraud, undue influence, or failure of consideration, he must, if he has received anything of value for the note, return the same or make a tender thereof before he can defeat the instrument as a cause of action by offering such defenses as an absolute bar to the action * * *"

Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83 (S.Ct., 1955) states:

> "'He who seeks equity must do equity.' Thus it is held that one seeking a cancellation of an instrument, with certain exceptions not pertinent here, must restore the original status; he cannot repudiate the instrument and retain the benefits received thereunder."

As to the Heller interests, they were not able to, or didn't trace these funds. See 57 Tex.Jur.2d 465, Trusts, § 72:

> "Although the relation between the parties where property has been unfairly acquired is important when undue influence is claimed and as an element to be considered in determining whether a trust was created, in order to establish a constructive trust and to impress it on title to property it is not essential to show such strict and technical fiduciary relationships as trustee and cestui que trust, principal and agent, or attorney and client; informal relationships such as moral, social, domestic, or merely personal ones, where one person trusts in and relies on another, are sufficient. However, though a relationship of trust and confidence may be shown to arise from a purely personal relationship, there must be sufficient evidence of a justifiable trust and confidence as will create a fiduciary relationship; mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship. Parties to a contract have an obligation to protect themselves by reading what they sign, and unless there is some basis for finding fraud, either actual or constructive, they may not excuse themselves from the consequences of failing

to meet that obligation because they unwisely trusted the other party."

and in the same reference, at § 90:

"As against third persons having a competing interest, in order to establish a claim to property on the theory that it is trust property it is incumbent on the claimant to trace the funds used in the purchase of property, or placed on deposit in a bank, as being his own or as being trust funds * * *"

and Morris Plan Industrial Bank of New York v. Schorn, 135 F.2d 538 (C.A.2d 1943):

"* * * Also in line is the well settled rule that property converted, embezzled, or otherwise taken by the bankrupt, or obtained by him by fraud, can be claimed from the bankrupt estate only so long as it can be definitely traced, with the consequence that an attempted repayment by the bankrupt prior to bankruptcy is a preference, except where made from the very property taken, Walser v. International Union Bank, 2 Cir., 21 F.2d 294, 298; Clarke v. Rogers, 228 U.S. 534, 33 S.Ct. 587, 57 L.Ed. 953, affirming 1 Cir., 183 F. 518; 3 Collier on Bankruptcy, 14th Ed., 814-818 * * *"

Further, Cunningham v. Brown, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1923):

"But, even if we assume that the payment of these unmatured notes was not according to the contract with Ponzi, and that what the defendants here did was a rescission for fraud, we do not find them in any better case. They had one of two remedies to make them whole. They could have followed the money wherever they could trace it, and have asserted possession of it on the ground that there was a resulting trust in their favor, or they could have established a lien for what was due them in any particular fund of which he had made it a part. These things they could do without violating any statutory rule against preference in bankruptcy, because they then would have been endeavoring to get their own money, and not money in the estate of the bankrupt. But to succeed they must trace the money, and therein they have failed. It is clear that all the money deposited by these defendants was withdrawn from deposits some days before they applied for and received payment of their unmatured notes. It is true that, by the payment into the account of money coming from other banks and directly from other dupes, the bank account, as such, was prevented from being exhausted; but it is impossible to trace into the Hanover deposit of Ponzi after August 1st, from which defendants' checks were paid, the money which they paid him into that account before July 26th. There was, therefore, no money coming from them upon which a constructive trust or an equitable lien could be fastened. Schuyler v. Littlefield, 232 U.S. 707, 34 S.Ct. 466, 58 L.Ed. 806; In Re [12] Mulligan, D.C., 116 F. 715; In Re A. D. Matthews' Sons, 2 Cir., 238 F. 785, 151 C.C.A. 635; In Re Stenning [1895] 2 Ch. 433, 13 Reports, 807, 73 L.T.N.S. 207. In such a case, the defrauded lender becomes merely a creditor to the extent of his loss, and a payment to him by the bankrupt within the prescribed period of four months is a preference. Clarke v. Rogers, 228 U.S. 534, 33 S.Ct. 587, 57 L.Ed. 953; In Re Dorr, 9 Cir., 196 F. 292, 116 C.C.A. 112; In re Kearney, D.C., 167 F. 995."

The awarding of these funds to the Trustee of the estate in bankruptcy would not be an "unjust enrichment" of Billie Sol Estes, but merely a relief to his creditors.

Since it cannot be denied that this case has been most thoroughly tried and that we have been favored with careful and extensive briefs from all sides, we do not remand this matter except as hereinafter stated, but affirm it, except that the trial court is hereby instructed to revise the judgment so as to grant the Intervenor, Harry Moore, Jr., Trustee of the Estate of Billie Sol Estes, Bankrupt, the funds ten-

dered into the registry of the court by the Barnes Group, in the amount of $81,299.52.

Therefore, the trial court's judgment is reversed and remanded only as to these instructions to the trial court to modify its judgment awarding such funds to the Intervenor, and as so reversed and remanded in part, with instructions, the judgment of the trial court is in all other respects affirmed.