Harvey W. CUMMINGS, Appellant,

v.

JESS EDWARDS, INC., Appellee.

No. 437.

Court of Civil Appeals of Texas.

Corpus Christi.

Sept. 11, 1969.

Rehearing Denied Oct. 23, 1969.

Allison, Baker & White, D. Yancey White, Corpus Christi, for appellant.

Lewright, Dyer & Redford, James W. Wray, Jr., Corpus Christi, for appellee.

## OPINION

SHARPE, Justice.

This appeal is from a take-nothing judgment rendered after jury trial in favor of Jess Edwards, Inc., appellee-defendant,

against Harvey Cummings, appellant-plaintiff.

Cummings sued Edwards for damages on account of personal injuries allegedly suffered when pipe was being unloaded from a trailer at Edwards' place of business in Corpus Christi, Texas. The record reflects that on January 12, 1963 Cummings was an employee of T. E. Mercer Trucking Company of Houston, Texas, and the driver of a truck-trailer combination which transported a load of pipe from Houston to Corpus Christi, Texas. The pipe was of uniform size about 30 feet in length except two joints of about 18 feet each. Cummings arrived at the Edwards' yard in Corpus Christi about 4:30 P.M., and five employees of Edwards (Frank Haywood, Mansfield Thompson, Tilman Walker, Jonah Rives and Lonnie Johnson) began unloading the pipe, with the aid of a gin truck. Cummings was injured at a time when he was under the pole trailer and a short joint of pipe fell from it and struck him.

The jury refused to find any primary negligence against Edwards but found three grounds of contributory negligence proximately causing the accident against Cummings. Those findings were in substance (1) that Cummings failed to tell any member of the Edwards crew that he was going under the load of pipe, (2) that Cummings failed to tell Frank Haywood that he was going under the load of pipe, and (3) that Cummings was negligent in crawling under the load of pipe with knowledge that there were short lengths of pipe in the load. The damage issues were answered in an aggregate amount of $10,000.00. Thus, there was no basis for rendition of judgment in favor of Cummings, and the verdict as returned required rendition of judgment for Edwards.

Appellant Cummings asserts seven points of error as grounds for a new trial. These fall into three general categories. Point one complains of exclusion of the alleged tape recording of a telephone conversation between appellant's witness John Bentley and appellee's witness Jonah Rives. Points two, three and four complain of the exclusion of testimony given by appellant's witness Dr. Richard Austin, a psychologist. Points five, six and seven complain of errors concerning the inadvertent sending of an exhibit to the jury room which contained statements directed to the compensation insurance carrier for appellant's employer and alleged jury misconduct in the discussion of insurance.

Appellant's point one asserts that the trial court erred in excluding the actual recording of a telephone conversation between the appellant's witness, John Bentley, and one Jonah Rives, a witness for appellee. Appellant's basic position under this point is that prior to the trial Jonah Rives, a witness for appellee, had made a statement over the telephone to one John Bentley, an investigator for appellant, concerning the whereabouts of Ruby James, foreman of the Edwards pipe yard, which was in conflict with his testimony at the trial, and that Bentley had made a tape recording of the conversation which was admissible for the purpose of impeaching Rives.

The testimony of Jonah Rives, called as a witness for appellee on the trial of the case, relative to the point under consideration was as follows:

"Q Where was Ruby James at the time that the, at the very time that this man got hurt, where was Ruby James?

A Oh, he was in the pickup."

\*    \*    \*    \*    \*    \*

"Q Did he ever go back up to the office after Mr. Cummings parked his truck, did Ruby ever go back up to the office after Mr. Cummings parked his truck, do you remember?

A No, sir, I don't recall, I don't remember.

Q You don't recall what?

A Him going back up to the office, he could have.

Q  You don't recall his doing that?

A  No, sir."

Thereafter, in response to questions propounded by counsel for appellant, Rives further testified as follows:

"Q  Mr. Rives, whenever you talked with Mr. Bentley on the telephone, did you tell him that you didn't know who was hooking up on front?

A  I told him I wasn't sure.

Q  All right, you deny then that you told him that you did not know who was hooking up on front?

A  Yes, sir, I said I wasn't positive who was hooking on the front.

Q  Did he ask you if there were any short joints on top of the thing?

A  No, sir, he asked me where was the short joint.

Q  Okay, then you deny, I take it, that he asked you, 'Did he have any short joints on top of that thing,' and you deny that you answered, 'Yes, sir.'

A  On top, yes, sir.

Q  You deny that?

A  Yes, sir, there wasn't any on the top.

Q  All right, did he ask you where Tillman was?

A  Yes, sir.

Q  Did you tell him in answer to this question, 'I see, okay, well listen, do you remember where Tillman was,' and do you remember if your answer was, 'No, sir, I don't.'

A  Well, where he was working?

Q  No, where he was.

A  At the time?

Q  Of the accident.

A  No, sir.

Q  No, sir, what?

A  I don't remember saying that.

Q  All right, sir, was Frank in the gin truck tied onto a pipe right before the short joint fell on Mr. Cummings?

A  Was there a hook in the pipe?

Q  Yes, sir.

A  Yes, sir, we was unloading.

Q  Well, then the answer was that you were tied into a pipe?

A  Yes, sir.

Q  Okay, and when Frank picked that one up, the short joint fell through, did it not, and hit Mr. Cummings on the hand?

A  Yes, sir, that's the way it happened.

Q  That's the way it happened?

A  Yes, sir.

Q  And therefore right after the accident, there would be a pipe picked up off of the load?

A  Well, we had picked up a number of pipes.

Q  I mean, what caused the accident, didn't you say it was the fact that a pipe was picked up and allowed, it allowed the short joint to fall through?

A  No, sir, I don't remember that, but when we picked the pipe up, and the pipe, as we picked it up, the first pipe, the pipe rolls down and it continued to roll down, and that short pipe was in the middle of the load somewhere, I don't know exactly where it was, but anyway, it did work its way through and fell through.

Q  Well, is it true or not, Mr. Rives, that when Frank, in the gin truck, picked up on the pipe that he was hooked onto, that left a place for the small joint to go through the load, there wasn't any other way that it could get through?

A  Yes, sir, it fell through.

Q  It fell through the place where Frank picked up the pipe?

A  No, sir.

Q  Okay.

A  Because he picked up the pipe from the outside.

Q  Do you recall the question, 'All right, was Ruby there when that happened,' did he ask you that?

A  Yes, sir.

Q  And was your answer, 'No, sir, he was up at the office but we went and got him and he come and got the man and taken him out to the hospital'?

A  I remember saying he was, we went and got him, he was in his truck, we went to the truck, at least somebody hollered and told him and he come and asked the man did he want to take him to the hospital, to the doctor, rather.

Q  All right, but what I am asking you is, do you deny that you said, 'No, sir, he was up at the office,' in answer to the question, 'All right, was Ruby there when it happened,' 'No, sir, he was up at the office but we went and got him and he come and got the man and taken him to the hospital'?" * * *

On rebuttal, appellant called the witness John Bentley who testified in part as follows:

"Q  Did you ask him, Mr. Bentley, anything with reference to where Ruby James was at the time that the accident happened?

A  Yes, I did.

Q  And where and what did he tell you in that regard?

A  He stated that Mr. James was at the office and as soon as the accident occurred they went to the office and got him and he took the man to the hospital in the pickup."

Bentley was not cross-examined by appellee. He did not mention in the presence of the jury that he had made a tape recording of his conversation with Rives. The jury was excused while appellant made an offer of proof and Bentley was then questioned on the subject. He testified that he had made a tape recording of the conversation with Rives and produced a spool of tape which he said contained that recording along with recorded statements of other witnesses. He ran the tape on to a small spool, winding it backwards, and it was identified as Plaintiff's Exhibit No. 13.

Counsel for appellant then made the following statement:

"MR. ALLISON: All right, Your Honor, in that respect we offer for impeachment purposes only the following portions only of such statement, and request in our offer that the Court allow us to play these portions for impeachment purpose for the jury's consideration for the impeachment of the witness, Jonah Rives. (Mr. Allison reading from instrument the following:) 'Question, All right, was Ruby there when that happened? Answer, No, sir, he was up to the office but we sent and got him and he come and got the man and taken him out to the hospital.'

"To tie that in, Your Honor, we offer the following portions: 'Question, All right, was Frank tied onto the joint then? Answer, No, sir, he wasn't tied onto that one, he was tied onto another—Question, All right. Answer, As, as he picked that one up, well the, well it breaks down you see. You starts on the front and whenever you pick up one, another one just slides right down in its place, you know, from the top to the bottom; it works all the way from the top to the bottom. Question, So when he picked up on that one, well that let that short one fall down? Answer, 'And when he picked this up to, the one he hooked with the hook, well, then, the short ones worked down to the bolster and it didn't hit the

bolster, it just went on through. Question, And that's when it hit his hand? Answer, Yes, sir. Question, All right, well, did they take him on to the hospital then? Answer, Yes, sir. Question, All right, was Ruby there when that happened? Answer, No, sir, he was up to the office but we went and got him and he come and got the man and taken him out to the hospital.'

"MR. WRAY: Are you through with that particular portion?

"MR. ALLISON: Yes, sir, we offer, first of all, the one question and answer for impeachment purposes; secondly, we offer the series of questions and answers, ending with the last single set of questions and answers, with reference to where Ruby James was when it happened, and we offer it for impeachment purposes.

"MR. WRAY: Your Honor, my objection to that, in addition to all the others I have made is, that it is impeachment on a collateral matter, where Ruby James was, and actually I think that Mr. Bentley's testimony to that effect is likewise subject to that objection, although I didn't make it.

"MR. ALLISON: We also offer the question: 'And when he went down under the trailer, do you recall Frank stopping unloading?' And that portion of Ruby James' answer: 'I think we started unloading this truck but I don't know who was hooking on the front.' Question: 'Did he have any short joints of,' excuse me, 'Did he have any short joint on top of that thing?' Answer: 'Yes, sir.' We offer that for impeachment purposes, separately and apart, of course, from the other offer; also separately from the other offer for impeachment purposes, we offer: I see, well, that's, well, listen—this is the question: 'I see, well listen, do you remember where Tillman was?' Answer: 'No, sir, I don't.' That completes our offer of proof, Your Honor."

The trial court on objection by counsel for appellee, ruled that plaintiff's exhibit No. 13 would not be admitted.

Appellee contends by four counterpoints that the tape recording was properly excluded in substance for the following reasons: (1) The conversation between Bentley and Rives was recorded without the knowledge or consent of Rives; (2) Appellant failed to establish a proper foundation for admissibility of the tape recording; (3) The evidence was cumulative only and exclusion was within the court's discretion; (4) If exclusion was erroneous, it was nonetheless harmless.

The parties have devoted a considerable portion of their briefs to questions of admissibility of the tape recording because Bentley did not advise Rives that the telephone conversation was being recorded, and the recording was made without the knowledge or consent of Rives. In such connection some interesting constitutional questions as well as the applicability of Sec. 605, Title 47, U.S.C.A. are presented. We have concluded that we need not reach these questions in connection with appellant's point one, and that appellee's contentions that the tape recording was properly excluded on other grounds are well taken.

We will first consider appellee's contention made under counterpoint No. 2 that the tape recording made by Bentley was properly excluded because appellant failed to establish a proper foundation for admitting it. We have not been cited to a Texas case which specifically sets out the requirements for authentication of tape recordings, although some of them make reference to that subject. See, e. g., Hutson v. State of Texas, 164 Tex.Cr.R. 24, 296 S.W.2d 245 (1956). The applicable rules are summarized in 58 A.L.R.2d 1024, "Admissibility of sound recordings in evidence", § 2, pp. 1027-8, as follows:

"* * * The cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording. They also indicate a reason-

ably strict adherence to the rules prescribed for testing the admissibility of recordings, which have been outlined as follows: (1) a showing that the recording device was capable of taking testimony, (2) a showing that the operator of the device was competent, (3) establishment of the authenticity and correctness of the recording, (4) a showing that changes, additions, or deletions have not been made, (5) a showing of the manner of the preservation of the recording, (6) identification of the speakers, and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement."

See also Steve M. Solomon, Jr., Inc. v. Edgar, 92 Ga.App. 207, 88 S.E.2d 167 (1955); State v. Williams, 49 Wash.2d 354, 301 P.2d 769 (1956); State v. Driver, 38 N.J. 255, 183 A.2d 655 (1962); United States v. McKeever (D.C.N.Y., 1958), 169 F.Supp. 426.

■ Appellant's offer of testimony and proof as contained in his bill of exception does not comply with any of the foregoing requirements. In particular, the record herein shows that a proper foundation for admissibility of the tape recording was not furnished for several reasons. The tape recording was not reproduced for the court and counsel. Bentley did not testify concerning the recording instrument used by him or his competency as an operator of it. Neither did he testify that the recording was authentic or correct or that it was complete, unedited, without changes, deletions or additions having been made. Bentley did not identify the speakers whose voices allegedly were recorded on the tape. Nor did he testify as to the custody of the tape recording or the manner or preservation thereof. Further, Bentley did not identify or vouch for the correctness of the transcript read by counsel for appellant which allegedly contained a portion of the recorded conversation.

■ The tape recording tendered by appellant (and its reproduction before the jury) was properly excluded on the basis that the proper foundation was not laid for its admissibility. We further hold that exclusion of the tape recording, under the circumstances, was at least discretionary, and abuse of discretion by the trial court is not shown. It also appears in any event that it is not shown that the exclusion of the tape recording, if error, was such as to cause and did cause the rendition of an improper judgment in this case. Rule 434, Texas Rules of Civil Procedure. The attempted impeachment of the witness Rives related only to the whereabouts of Ruby James at the time of appellant's accident. James did not claim to be an eyewitness to the accident or to the activities of appellant or the Edwards' employees immediately prior thereto. There was ample evidence aside from the testimony of Rives to support the contributory negligence findings against Cummings. Appellant's point one is overruled.

■ Appellant's points of error 2, 3 and 4 complain of the alleged errors of the trial court in excluding the testimony of Dr. Richard Austin, a psychologist, in connection with (1) his opinions and conclusions based on written tests and his personal evaluation of appellant; (2) his direct testimony relating to his conclusions and opinions after studying the tests; (3) his opinions and conclusions with respect to hypothetical questions based on the assumption that such written tests were administered to appellant plus the assumption of testimony in evidence heard by Dr. Austin. Dr. Austin, a clinical psychologist, examined Cummings on the afternoon and evening before testifying on the trial of this case to determine whether Cummings had "functional overlay or conversion hysteria." It is undisputed that Dr. Austin examined for the purpose of giving his testimony in this case and not for treatment of appellant. During the early portion of direct examination of Dr. Austin, counsel for appellee took him on voir dire examination and thereafter objected to his testimony on the ground that it was based upon subjective

symptoms. After this objection was sustained the testimony of Dr. Austin was developed on bill of exception. We have concluded that these points do not present error or reversible error.

The jury here not only refused to make findings of primary negligence which would establish liability against Edwards, but affirmatively found contributory negligence against Cummings proximately causing the accident in question. There was no basis for judgment in favor of Cummings and the findings of the jury on the damage issues became immaterial. Southern Pine Lumber Co. v. Andrade, 132 Tex. 372, 124 S.W.2d 334 (1939). Appellant argues that the exclusion of Dr. Austin's testimony constituted prejudicial error because it related to credibility of appellant's own testimony and to the issue of liability as well as damages. We disagree. We have not been cited to any authority supporting the view that an expert opinion should be received in evidence for the purpose of proving that another witness is telling the truth. The tendered evidence was not admissible in connection with credibility of appellant's testimony or for the purpose of bolstering his testimony. We believe that the excluded testimony of Dr. Austin was relevant only on the issue of damages. We do not perceive error in exclusion of the tendered testimony, but if there was it became immaterial under the circumstances shown by the record, particularly because there was no finding of liability against appellee and there were complete defensive grounds found against appellant precluding his recovery.

Appellant also contends that the trial court erred in excluding Dr. Austin's testimony based upon a hypothetical question and the diagnostic tests administered to appellant. On bill of exception, Dr. Austin testified, among other things, that he could give an opinion as to whether or not appellant was suffering from a conversion hysteria based on the evidence he had heard on the witness stand and the facts stated in the hypothetical question propounded to

him, exclusive of his personal interview with appellant. Appellant does not sufficiently identify the hypothetical question referred to and does not make appropriate references to the record so that we may with certainty from his presentation determine what is being complained of. However, appellee's brief identifies the hypothetical question (offered by appellant on bill of exception), appearing at Statement of Facts, Page 332, lines 17–25, and page 333, lines 1–11, as follows:

"Q   Doctor, let me ask you this, Doctor, I will ask you to assume that Harvey Cummings, and Dr. Welch has testified that Harvey Cummings is depressed, I will ask you to assume that Harvey Cummings, in spite of a bad left hand and arm, has worked very hard to get a job, and has gone out and tried hard to support his family, his wife, I will ask you to assume that Harvey Cummings is worried and concerned about the well being of his family, he is worried and concerned about the fact that his wife now has to support him, and that his wife does not feel well, that he is worried about his future as far as his employability, I will ask you if that, generally speaking, is his a type of personality that develops a conversion hysteria?"

It appears here that appellant was asking one expert to state an opinion based in part upon the assumed opinion of another expert, particularly wherein Dr. Austin was asked to assume that "Dr. Welch has testified that Harvey Cummings is depressed", without the question reciting the facts testified to by Dr. Welch. The record shows that Dr. Welch, a witness for appellant, had testified to much more than that Cummings was depressed, including his opinion that Cummings had to some extent a conversion hysteria. We again believe that the question asked by appellant related only to the question of damage and not to the liability issues. In any event we hold that determination of the propriety of the question, under the conditions stated, was within the discre-

tion of the trial court, and abuse is not shown. See Texas Practice, Evidence, McCormick & Ray, Vol. 2, Secs. 1403, 1404. Appellant's points 2, 3 and 4 are overruled.

By his fifth point of error appellant contends that he is entitled to a new trial because certain medical bills offered in evidence by him for consideration only by the judge were improperly allowed to go to the jury room, said bills showing that they were directed to the compensation carrier for appellant's employer or, alternatively, that appellant was covered by some type of insurance for medical expenses. Appellant's sixth and seventh points of error assert jury misconduct. Under point six it is contended that prior to answering issues concerning negligence and proximate cause the jury considered that insurance was available through the employer of appellant. Under point seven appellant contends that the jury discussed insurance benefits of which appellant could have and did avail himself as shown by certain medical bills and observations of jurors that appellant had been paid.

The record reflects that appellant's exhibit No. 14 consisted of a sheaf of bills for medical expenses offered in evidence by appellant before the court and not the jury. Various bills included in that exhibit had the name of Aetna Casualty and Surety Company written on them. When the jury retired to deliberate the exhibit was inadvertently sent to the jury room along with other exhibits. The inadvertence was discovered within about 45 minutes to one hour, and the bailiff reclaimed all exhibits, removed exhibit No. 14 and then returned the remainder to the jury.

On the hearing of the motion for new trial seven of the jurors were called as witnesses, three by appellant and four by appellee. Appellant called Miss Jane Stamm, Mrs. Clyde B. Guthrie and Mr. Alejandro Trevino. Appellee called Mr. L. C. Theus, Jr., Mr. Billy E. Turner, Mr. Adolfo L. Weilbacher and Mrs. Evelyn B. Wilson. The testimony of the jurors called by appellant was in large part directed to the conduct of the jurors Weilbacher and Turner during the deliberations. Although it appears from the record that plaintiff's exhibit No. 14 may have been in the jury room for an hour or so, there was no direct testimony that any of the jurors noticed the words "Aetna Casualty and Surety Co." on the statements or bills included therein.

The juror Adolfo Weilbacher, called as a witness by appellee, testified that he looked through the sheaf of exhibits on the table during the first 45 minutes or hour after getting to the jury room; that he might have seen exhibit No. 14 but did not remember it; that he did not wholly know what was in the exhibits at the time he received them; that he did not remember seeing any exhibit that was addressed to Aetna Casualty and Surety Company or with that name on it. However, in answer to questions propounded by counsel for appellee, Weilbacher testified as follows:

"Q All right, sir. Let me ask you if there was ever any discussion of workmen's compensation benefits or insurance that may have been paid to Mr. Cummings? Was that ever discussed in the jury room?

A Not workmen's compensation, but insurance was."

Weilbacher further testified that the discussion first occurred when the jury was considering the issues on money and not before; that the issues were answered in numerical order and after the first 16 issues on negligence and proximate cause were answered the jury did not thereafter go back and change the answers to those issues. On cross-examination by counsel for appellant, Weilbacher testified in part as follows:

"Q All right. Now, you say that when insurance was brought up everybody decided that it was something that you shouldn't talk about or something like that?

A No, we decided that, well, since all the question started out 'according to

the preponderance of the evidence,' and it wasn't brought in the evidence, we should not consider it the fact—

Q But let me ask you this: Inasmuch as you said everybody agreed to that, I presume you're taking the position that everybody, by this time, everybody knew there was workmen's compensation insurance involved?

A Well, somebody had brought it up, so I'm sure everybody presumed that it was. I don't know. I can't answer for everyone else.

Q Okay. Who brought it up, by the way?

A It was either myself or Turner, because one of the statements that was left—with the—that the bailiff brought back in had Southern Mutual or something on it, insurance company.

Q Oh, in other words, you had an exhibit with the name of a company on it?

A Yes.

Q As—in other words, it did actually have the name of a company?

A Yeah, I believe it was an admittance form to a hospital."

Weilbacher further testified that since he went through all of the exhibits, plaintiff's exhibit No. 14 would have been one of them, if it was in fact in the jury room.

The juror Billy E. Turner testified in part as follows: That the deliberations of the jury had been going on quite a while before he looked at the exhibits; that he did not believe that he looked at the exhibits before getting to the damage issues; that he did not see any of the bills; that he did not believe he saw plaintiff's exhibit 9; that there was a discussion as to whether or not Mr. Cummings had received workmen's compensation insurance; that this occurred while the jury was talking about how much money Cummings received for his medical bills; that there had been no discussion of workmen's compensation

before that time, nor before plaintiff's exhibit No. 14 was removed from the jury room; that he saw one exhibit that said "Industrial" and this was in connection with the subject of insurance; that he was pretty sure something was said about not considering or discussing insurance; that they did not spend much time on discussion of insurance.

The juror Miss Jane Stamm testified in part that before the exhibits were removed they were near two young jurors later identified as Weilbacher and Turner. Miss Stamm did not see exhibit No. 14. She said that after the jurors started answering the damage issues there was some discussion as to whether Cummings had received insurance payments from his employer, and that the foreman or the juror Mrs. Wilson said the jury was not to consider the question of insurance, and that there was no more discussion of that subject until the jury was ready to leave the jury room and return its verdict, when a side remark about insurance was made.

The juror Mrs. Clyde Guthrie testified in substance that the discussion of insurance came before consideration of the damage issues. The juror Alejandro Trevino testified that the discussion of insurance was in connection with certain exhibits which he did not identify. Mr. L. C. Theus, Jr., the jury foreman, testified that the issues were answered in numerical order. At the time insurance was mentioned the liability issues had been answered and the discussion concerned the damage issues. He told the jury "Well, we are supposed to take what the Court has ruled on—let's go back and keep it the way it's supposed to be here. Whether he's got insurance or not, this has nothing to do with the trial." Theus said there was no discussion of insurance after that.

The juror Mrs. Wilson said that the jury had not started answering questions at the time the exhibits were removed. She said that she saw plaintiff's exhibit 14, but did not see the part that said "Aetna Casualty & Surety Company." "* * * It looked

like a bunch of bills, and I laid it down." She had no idea that Aetna Casualty & Surety Company was in any way involved in this case and did not recall that Aetna Casualty & Surety Company was discussed in the jury room. She thought that the discussion of insurance had come during the discussion of the first damage issue. The discussion was "very brief". After the issues on negligence and proximate cause had been answered, the first 16 issues, the jury did not go back and change the answers to any of them. Mrs. Wilson stated that she commented in the jury room "Well, I'm sure that * * * this man is covered by workmen's compensation because this is a state law." Mrs. Wilson said that the foreman Theus was "very persnickety" in his insistence that the deliberations be orderly and in the hearing of everyone.

The testimony on the hearing of appellant's motion for new trial raised several issues of fact which were impliedly found by the trial court against appellant when his motion was overruled. There was at least an issue of fact as to whether any juror saw those portions of plaintiff's exhibit No. 14 which were allegedly harmful to appellant, and such issue could properly have been and was impliedly found against appellant. The only other direct reference to insurance in the exhibits was on plaintiff's exhibit 9, which was offered and admitted into evidence without deletion or limitation. That exhibit included a printed form of the Tideland's General Hospital, Channelview, Texas, containing a line under which the words "Insurance Co." appeared and immediately above the word "Industrial" was typed. The same line contained the words "Indv." and "Group" above which were blank spaces. It thus appears that appellant's own exhibit injected the subject of insurance into the case. Of course the jury should not have considered the existence of insurance in connection with any of the issues submitted to it. However, it appears here that to the extent that insurance was indicated in plaintiff's own exhibit, the error, if any, in the jury reading or observing such notation was invited, and appellant would not be entitled to relief on that basis. See Hoffman v. French, Ltd., 394 S.W.2d 259, 265 (Tex.Civ.App., Corpus Christi, 1965, wr. ref. n. r. e.).

Aside from the exhibits, it appears that there was some testimony that workmen's compensation insurance or insurance was mentioned while the jury was deliberating. However, it also appears that there was testimony tending to show that the discussion of insurance was brief; that its discussion was rebuked; that the discussion took place after the liability issues were answered; and in the absence of express findings the implied findings of the trial court are to such effect. See Brawley v. Bowen, 387 S.W.2d 383 (Tex.Sup.1965). We therefore hold that appellant has not carried the burden of showing that the alleged errors and misconduct were material or that injury probably resulted to him. In this situation we must sustain the action of the trial court in overruling appellant's motion for new trial. Appellant's points 5, 6 and 7 are overruled.

The judgment of the trial court will be affirmed.