In the Matter of Garth C. BATES,
Judge, 174th Judicial
District Court.

No. B–6451.

Supreme Court of Texas.

July 11, 1977.

John L. Hill, Atty. Gen., Max Flusche, Asst. Atty. Gen., Austin, for Judicial Qualifications Commission.

Wade, Rasmus & Washington, Craig Washington, Houston, for Garth C. Bates.

GREENHILL, Chief Justice.

The Judicial Qualifications Commission of Texas instituted this proceeding and has recommended the removal of Garth C. Bates, Judge of the 174th District Court of Harris County. The proceedings were instituted following the arrest of Judge Bates and his subsequent indictment on criminal charges of bribery.

Section 1–a(6) of Art. V of the Texas Constitution provides for the censure or removal of any judge for these reasons:

" . . . willful or persistent conduct, which is clearly inconsistent with the proper performance of his said duties or casts public discredit upon the judiciary or administration of justice; . . .."

We agree with the recommendation of the Judicial Qualifications Commission that Judge Bates should be removed under the foregoing provision of our constitution; and he is hereby removed.

The testimony in this case is lengthy. It is contained in ten (10) volumes of testimony, in depositions, and upon tapes which were admitted by the Master appointed by this Court to receive the evidence. Only the essence of the testimony may be set out herein. The Master, the Honorable Walter E. Jordan, Judge of the 48th District (Ft. Worth, Tarrant County), made a summary in his Master's Report. The entire record has been fully considered by this Court. One of Judge Bates' points here is that there is no evidence, or insufficient evidence, to support the findings and conclusions of the Commission. We disagree. The matters set out below from the Mas-

ter's Report are, in our opinion, fully supported by the record.

It should be noted at the outset that Judge Bates did not file an answer to the Commission's charges, and he never appeared in person while the Master was receiving evidence during a 10-day period in his home city of Houston. His counsel made several preliminary motions, but Judge Bates made no denial; and he did not testify. He appeared through very able counsel,[1] and his grounds for rejection of the Commission's findings and recommendations include points alleging that he was not given due process and that certain portions of the evidence should not have been admitted. These points will be discussed below.

After having heard the evidence and having read the evidentiary record, the Master's Report states in part that Judge Bates was charged by the Commission,

"with acceptance of a pecuniary bribe from one Nukie Fontenot, in return for a commitment by the Judge that Fontenot would not serve any prison term for the crime of theft and aggravated robbery, with which Fontenot was charged in Judge Bates' Court."

■ Judge Bates was entitled to receive, and did receive, notice as to these particular charges; but the grounds for his removal are set out in the Constitution, "willful or persistent conduct . . . which is clearly inconsistent with the proper performance of his said duties, or [conduct which] casts public discredit upon the Judiciary or [the] administration of justice. . . ." The criminal charges against Judge Bates are the subject of a separate criminal proceeding, now upon appeal.

The Master's Report, which we adopt for these purposes, sets out the pertinent facts:

"Nukie Fontenot, Manager of the Northwest Jewelry and Loans, a pawn shop at 1434 Atkins in the city of Houston, Texas, was originally, sometime in 1975, charged with receiving and concealing stolen goods, and later was re-indicted for theft and aggravated robbery arising out of the same transaction, the robbery of a private home owned by people by the name of Mize. Some time in late 1975, October or November of that year, Fontenot was introduced to one Ed Riklin, by one Jerry Kottwitz, a Fontenot friend. The evidence very clearly shows throughout that Riklin was a professional gambler, whose reputation at best was questionable, and who was a close personal friend of Judge Garth C. Bates.

"During the period between late 1975 and July 16th, 1976, Fontenot had many meetings and conversations with Riklin, who during most if not all of these conversations indicated and represented to Fontenot that he could, for the proper amount of money, secure and obtain from the offices of Judge Garth C. Bates a deal whereby Fontenot would not serve any time on any criminal charges arising out of the Mize robbery. According to the evidence, Riklin represented to Fontenot that he was close to Judge Bates, that the relationship with Judge Bates was like father and son, and that he could help Fontenot out of his troubles by getting Judge Bates, in whose Court the charges against Fontenot were filed, to be lenient with Fontenot. Between March 4th and July 16th, 1976, Fontenot had some twenty (20) or twenty-five (25) different telephone conversations with Ed Riklin, all dealing with the proposition that for the proper payment Fontenot could obtain the required assistance from Judge Bates.

"Sometime in early March, 1976, Detectives Nuccia and Musick of the Houston Police Department contacted Fontenot, telling him in a recorded conversation that they, the Houston Police Department and the Harris County District Attorney's Office, knew what was going on between him,

---

1. The Master found that "All attorneys in the hearing were diligent, competent, respectful and professional. Each represented his clients with great ability and industry." This matter is noted because before the case was argued in this Court, Judge Bates discharged his counsel and employed an attorney who is a member of the Legislature who was in attendance at its session. This Court granted him a delay of approximately 30 days to adjust his schedule and to prepare for the oral argument.

Ed Riklin and Judge Bates, and that the only way Fontenot could be helped with respect to the criminal charges pending against him was for him, Fontenot, to assist the police and District Attorney in the investigation and prosecution of Judge Bates. Fontenot agreed to assist the authorities, and accordingly all conversations between Fontenot and Riklin, and two (2) conversations between Fontenot and Judge Bates, were recorded on tape, and some of them were played into evidence at this hearing.

"Mr. Fontenot's testimony is very lengthy, and must be read for the full significance thereof. Only the highlights of his testimony are set forth herein. His testimony may be found in Volumes Two, Three and Four of the Statement of Facts, beginning on Page 175 and ending on Page 506.

"The negotiations with respect to the transaction between Fontenot and Riklin went on, with the full knowledge and consent of representatives of the Houston Police Department and the Harris County District Attorney's Office until Friday, July 16th, 1976. The testimony of Detective Musick, Special Investigator D. I. Baker, and former Assistant District Attorney Robert C. Bennett, Jr., as well as that of Fontenot, and others, reflect this fact.

"On July 15th, 1976, the evidence shows without dispute that the Harris County District Attorney's Office, through Robert C. Bennett, Jr., arranged for a temporary loan in the amount of $60,000.00 from a Houston bank, . . . .. This sum was obtained on July 15th, 1976, by Mr. Bennett, and was by him deposited in a safe in the Special Crimes Bureau of the District Attorney's Office on the afternoon or early evening of July 15th, 1976 * * * [T]he Record shows that before the $60,000.00 [in $100 bills] was placed in the safe, every bill was Xeroxed, and the Xeroxed copies of the bills, as well as the serial number on each bill was retained by the District Attorney's Office and later admitted into this Record as Examiner's Exhibit No. 11.

"In the early morning of July 16th, 1976, Mr. Baker deposited $59,000.00 of this sum of $60,000.00 in a safety deposit box belonging to Nukie Fontenot at the Northwest National Bank, Northwest Mall, Houston, Texas. The evidence shows that only $59,-000.00 was deposited in Fontenot's safety deposit box for the simple reason that $1,000.00 of the total $60,000.00 was inadvertently left in the Xerox machine the evening before, on July 15th, 1976, when the entire $60,000.00 was Xeroxed.

"Sometime around 9:00 o'clock, on the morning of July 16th, 1976, Nukie Fontenot came to the Northwest National Bank, got the money from his safety deposit box and gave it to Ed Riklin, who put it in his own briefcase. The evidence shows that at this time when Fontenot was present at this bank, present also was Riklin, Judge Garth Bates and one James H. Brown, a long time friend of Judge Bates, who served the Judge as his accountant and Adult Probation Officer. Also present in the vicinity in different cars, in addition to the ones mentioned above, were Detective Earl Musick and Special Investigator D. I. Baker.

"The officers attempted to follow Mr. Riklin, Judge Bates and Mr. James H. Brown, who were all in separate cars. The officers, however, lost the subjects and didn't see any of them again until later in the day. The Record reflects that Officers Nuccia, Musick, Baker, Vasquez, Rogers, and perhaps others, were at Ed Riklin's apartment at 2320 McCue Street in the city of Houston in the early afternoon of July 16th, 1976, and that at about 2:30 p. m. on that afternoon these officers arrested Ed Riklin in front of his apartment. The evidence shows that Riklin came running out of his apartment with a chrome plated sawed off shotgun, which he was waving around, and the officer disarmed and arrested him.

"Immediately after Riklin was arrested by the officers, Judge Bates drove up in his Cadillac, and all the officers involved in the arrest of Riklin, saw the Judge pull up in his car. Judge Bates apparently, according to Investigator Baker and Officer Musick, observed what was going on and immediately started to back up in an attempt to

leave the area. However, he was surrounded by all of the officers there present, and was stopped and ordered out of the car. Detective Earl Musick was the one who actually ordered the Judge out of his car and placed the Judge under arrest. He told the Judge not to reach in his pocket because, 'you may have a pistol—and I have to handle this in the usual manner.' Judge Bates did have a pistol on the front seat, but declared that he did have a right to carry it. When he stepped out of the car, Judge Bates told Musick that he couldn't find the keys to his car and asked Musick to look in his coat pocket for his car keys. He did so, and found in Judge Bates' coat pocket $2,900.00 in $100.00 bills. Several of these hundred dollar bills were immediately turned over to Special Investigator Baker who checked the serial numbers on the bills found in Judge Bates' pocket against the list of serial numbers on the bills obtained the day before, July 15th, 1976, by Mr. Robert C. Bennett from the unnamed bank, and the serial numbers of the bills appearing on the list held by Mr. Baker.

"The officers also found the pistol on the front seat of the Judge Bates' car, and in addition found a deposit receipt from the First City National Bank of Houston, Texas, for a deposit made on July 16th, 1976, in the amount of $1,100.00 by Judge Bates. The deposit was made to Account No. 50–3785–9, and this deposit receipt is in the Record as Examiner's Exhibit 18. Further testimony revealed that his deposit was earlier on the afternoon of July 16th, 1976, by Judge Bates with part of the money turned over by Nukie Fontenot to Ed Riklin earlier that day. [sic] There is no question . . . that this $1,100.00 as well as the the $2,900.00 found in Judge Bates' coat pocket is part of the total of $60,000.00 obtained by Mr. Robert C. Bennett from the unnamed bank on July 15th, 1976, and paid on the morning of July 16th, 1976, by Mr. Fontenot to Ed Riklin. The testimony of James H. Brown, found in Volume Four and Five of the Statement of Facts, shows clearly and convincingly the distribution of the $60,-000.00 [$59,000] handed by Fontenot to Riklin, in Brown's office later in the morning of July 16th, 1976.

"Mr. Brown's testimony and other testimony, also painfully demonstrates clearly that $10,000.00 of the $60,000.00 [$59,000] delivered by Fontenot to Riklin was turned over to Brown by Riklin, at Judge Bates' direction. Later that day he [Brown] took the $10,000.00 to a bank in Dickinson, Texas, where he purchased a Cashier's Check in that amount, and later the same day delivered the Cashier's Check to a title company in Houston as a downpayment or escrow deposit, on behalf of Judge Bates on a transaction involving the purchase by Judge Bates and others of an apartment complex known as the Beacons Field Apartments.

"The evidence is very clear and convincing that this $10,000.00, used in behalf of Judge Bates, was part of the money obtained by the District Attorney's Office from the unnamed bank for the payment of the bribe by Riklin to Judge Bates. The evidence is also overwhelming to the effect that in addition to this $10,000.00, as stated before, the sum of $2,900.00, found in Judge Bate's [sic] pocket on July 16th, 1976, and the sum of $1,100.00 deposited by him in the First City National Bank of Houston, totaling $14,000.00, all coming [came] out of the original $60,000.00 obtained by the District Attorney's Office.

"In the early afternoon of July 16th, 1976, before the arrest of Ed Riklin and Judge Bates, Nukie Fontenot called Judge Bates at the Judge's home, from the Special Crimes Bureau of the District Attorney's Office. This conversation was recorded and played into evidence as Examiner's Exhibit 9. This tape, if listened to carefully, is most damaging to the Judge. This call was made at the instance of one or more of the officers involved in this matter and was listened to on an extension by a young detective. The purpose of the conversation on July 16th between Fontenot and Judge Bates was to obtain concrete evidence from Judge Bates himself concerning the bribe. During this conversation when prompted by Fontenot, Judge Bates told Fontenot to depend on Ed Riklin, saying, 'You don't need

any lawyer'—'you just deal with Ed'—'I'll help Ed'—'and I'll help you.' He also said, among other things, 'I'm doing this for Ed Riklin.' " [2,3]

The Master's Report concludes:

"I find that on July 16th, 1976, Judge Garth C. Bates did agree to accept, and did accept from Nukie Fontenot the sum of $59,000.00 with the intent of wrongfully and unlawfully, and in violation of his Judicial Oath and duty, helping and assisting the said Fontenot escape punishment, and more specifically imprisonment, for the crime with which Fontenot was charged, regardless of the outcome of the prosecution thereof. It should be pointed out that the Record is not clear, and there is no direct testimony from the Judge, as to precisely what form the help for Fontenot would take. There is no direct testimony specifically whether it would take the form of dismissal, acquittal, probation, or any other form of assistance was to be given Fontenot. However, the telephone conversation between Fontenot and Judge Bates on the early afternoon of July 16th, 1976, and the acceptance of part of the amount of money by Judge Bates, implies, and in fact insists that there was a quid pro quo offered or to be offered by Judge Bates to Nukie Fontenot.

"I further find, from a clear preponderance of the evidence, that the conduct of Judge Garth C. Bates, as herein outlined, was and is clearly inconsistent with the proper performance of his judicial duties, and that it casts discredit upon the judiciary and the administration of justice." [4]

The members of the Judicial Qualification Commission, after reviewing the record, reached the same conclusion as the Master did, and as we do.

2. Master's Report pp. 17–27.

3. The record also shows that pursuant to an agreement to search given by Riklin, $30,000 of the $100 bills were found in a pillow in Riklin's apartment. Earlier in the afternoon of the same day, Judge Bates had been apprehended.

4. Master's Report pp. 27–28.

## REQUEST TO HAVE THE TAPES EXAMINED

During oral argument, on April 13, 1977, counsel for Judge Bates asked the court to grant him a week to file a supplemental brief and a motion to have the originals of the tapes examined by an "expert" to determine if they had been tampered with. The motion and request by Bates' counsel was received by this Court approximately 3 weeks later.

■ The Examiner * thereafter filed a motion on May 10, 1977, suggesting the tapes be sent to Washington, D. C. for examination by the Federal Bureau of Investigation. Counsel for Judge Bates opposed such investigation by the F.B.I., and requested that this Court send the tapes to Salt Lake City, Utah, there to be examined by Dr. Tom E. Stockham. Rule 21(d) authorizes this Court, for good cause shown, to permit the introduction of additional evidence.[5] Judge Bates suggests here for the first time that the tapes might have been purposely altered. No basis is shown for this new contention. We overruled both these motions. Upon review of the record we found that the evidence establishing a chain of custody, and that the evidence establishing a predicate for the introduction of the tapes, gave us no reason to suspect that any alteration has occurred. Judge Bates presented no such evidence or argument. Never before during the course of two hearings involving the introduction of these tapes did Judge Bates make this complaint. His counsel had numerous *other* objections, but not this one. The brief filed by his counsel in this Court before the oral argument makes no such observation or objection. Indeed, it is evident from the rec-

* Counsel for the Judicial Qualifications Commission. *See* Rule 1(e).

5. All reference to Rules unless otherwise specified are to the Rules for Removal and Retirement of Judges, Adopted and Promulgated by the Supreme Court of Texas (1966), as amended on July 20, 1971, as required by Section 1–a(11) of Article V of the Texas Constitution.

ord that before the Master's hearing, the Judge's counsel had copies or transcriptions of the tapes. We did not feel that good cause for further delay of a decision in this matter had been presented. Moreover, the tapes are evidence in the criminal case against Judge Bates which is pending on appeal, and in the criminal case against Ed Riklin, who is accused of the same crime.

## MATTERS IN ABATEMENT

As was the case in *In the Matter of O. P. Carrillo,* 542 S.W.2d 105 (Tex.1976), we must determine the effect on this proceeding of two events outside the control of this court: (1) the acts of misconduct found by the Master and the Commission occurred before Judge Bates was re-elected District Judge on November 2, 1976; and (2) there was a concurrent criminal proceeding against Judge Bates, which began on November 1, 1976, which involved the same facts which were before the Master at the hearing.

We will deal first with Judge Bates' reliance on the "prior term" or "forgiveness" doctrine which he contends constitutes a complete defense to this action for removal.

Judge Bates erroneously relies upon Article 5986, which says:

"No officer in this State shall be removed from office for any act he may have committed prior to his election to office." [6]

Judge Bates also relies on statements regarding the "forgiveness doctrine" found in opinions of this court in *In re Brown,* 512 S.W.2d 317 (Tex.1974), and *In the Matter of O. P. Carrillo, District Judge,* cited just above.

We have consistently held that the above statute is not applicable to these proceedings, which are authorized by the Texas Constitution, Article V, Section 1–a. Article 5986, is a legislative Act authorized by a different portion of our Constitution, Article XV, Section 7, which states that the legislature may provide for removal of officers for whom the mode of removal is *not* provided in the Constitution.

Until 1965, Article XV of the Texas Constitution provided the only three methods or modes for the removal of district and appellate judges: The first method applicable to district and appellate judges is impeachment by the House of Representatives, the articles of impeachment to be tried by the Senate, as provided in Sections 1, 2, 3, 4 and 5 of Article XV. A second method for the removal of these judges is by the Governor on address of two-thirds of each House of the Legislature as provided in Section 8 of Article XV. The third method, applicable only to district judges, is provided in Section 6. It involves an original action of the Supreme Court after a hearing on causes which are presented by the sworn testimony of not less than 10 lawyers practicing in the accused judge's court. Section 7 of this same Article XV provides authority for the legislature to create new "modes" for removal of officers, the removal of which is *not provided for in the constitution.* The statute upon which Judge Bates relies was enacted under the authority of this Section 7, Article XV, and is not applicable to proceedings under any of the removal methods provided for in the Texas Constitution. In 1965, Article V, Section 1–a, was added by amendment to the Constitution and provides this alternative method of removal of judges by the Supreme Court on recommendation of the Judicial Qualifications Commission.

Even though the statute quoted above is not applicable to these removal proceedings, this Court has noted the legislative *policy* announced in Art. 5986. *In re Laughlin,* 153 Tex. 183, 265 S.W.2d 805, 808 (1954). We reserve for further consideration any application of the policy in cases of removal brought under Article V, Section 1(a), Tex. Const.

■ Without holding that the legislative policy is also applicable to these proceedings under Article V, Section 1(a), this Court has twice found (*Brown* and *Carrillo, supra*) that even if the policy announced in *In re*

6. Statutory references are to Vernon's Annotated Civil Statutes of Texas.

*Laughlin, supra,* were applicable, it would not affect the outcome of the case in question. The same is true here.

Moreover, the policy announced in *In re Laughlin* contains a limitation:

"Neither may removal be predicated upon acts antedating election, *not in themselves disqualifying under the Constitution and laws of this State,* when such acts were a matter of public record or otherwise known to the electors and were sanctioned and approved or forgiven by them at the election. This holding is in harmony with the public policy declared by the Legislature with respect to other public officials." [Emphasis ours]

The acts of Judge Bates while in office, but which antedate the re-election of Judge Bates, were acts which are *"disqualifying under the Constitution and laws of this State."* [7] Since the acts of Judge Bates while in office and before his re-election were disqualifying under the Constitution, they would not be forgivable under the so-called "forgiveness doctrine." The point is overruled.

■ We next come to Judge Bates' contention that the hearing before the Master should have been postponed until after the criminal prosecution, styled *The State of Texas v. Garth Bates,* which was pending in the 208th District Court of Harris County. We agree with the decision of the Master that this proceeding is a separate and distinct matter and completely independent of any other proceedings which were pending.

Judge Bates had sufficient time to prepare for the Master's hearing, and his right to testify was fully protected under the confidentiality required in the Rules for the Removal and Retirement of Judges. Rule 19. Such testimony could not be used to his

detriment in the criminal trial. We also note that the Judge chose not to appear before the Commission in its hearings in this matter on December 17, a date *following* the completion of his criminal trial. The Commission notified Judge Bates by letter that he had the right to appear under Rule 14. He was represented by counsel. Under Rules 16b and 21d both the Commission and this Court may direct the taking of additional evidence. Judge Bates has at no time requested that he be allowed to give testimony.

There could be more than a two-year delay if we awaited the final disposition of the criminal charges. We agree with the Master's decision to handle this matter as expediently as possible. The original date for the hearing, October 4, 1976, was set with a view of accommodating Judge Bates' wishes that the hearing follow the criminal case which was then set for September 21st. The Commission might have changed, but was under no obligation to change, the date of the hearing so as to accommodate a change in the date set for the criminal trial from September 21st to November 1.

## DUE PROCESS

Judge Bates contends that he was denied due process in the proceeding before the Master.

### Notice

First, he alleges that the Notice of Formal Proceedings failed to specify "in ordinary and concise language the charges against the Judge" and the "alleged facts upon which such charges [were] based" as required by Rule 4(b) of the Rules for the Removal or Retirement of Judges.

---

7. Tex.Const. Art. XVI, § 41:

". . . [any] judicial officer who shall solicit . . . or consent to receive . . . for himself, or for another, . . . any money . . . for his vote or official influence . . . or with any understanding, expressed or implied, that his vote or official action shall be in any way influenced thereby, or who shall solicit, demand and receive any such money . . . for another, as the consideration of his vote or official influence in consideration of the payment or promise of such money, advantage, matter or thing to another, shall be held guilty of bribery within the meaning of the Constitution, and shall incur the disabilities provided for such offenses, with a forfeiture of the office they may hold, and such other additional punishment as is or shall be provided by law."

■ Judge Bates received Notice of Preliminary Investigation on July 21, 1976, pursuant to Rule 3(b). The Notice advised the Judge that the Judicial Qualifications Commission was investigating the charges of bribery described in the indictment returned by the Grand Jury. Included in the Preliminary Notice was the text of the Grand Jury indictment which recited the facts upon which it was based. Pursuant to Rule 4(b), Judge Bates was sent a second notice, a Notice of Formal Proceedings, on August 12, 1976. Again, the facts upon which the charges were based were sufficiently outlined. Judge Bates was notified that bribery was the charge against him. He had notice that he was accused of acting as a party with Ed Riklin in accepting money in return for his agreement not to sentence Nukie Fontenot to jail. He also allegedly agreed to be lenient in the sentence imposed, and to help in other respects regarding his case. We find the alleged acts of misconduct were stated with sufficient clarity to constitute notice such as would enable the Judge to know and defend against the charges preferred. Therefore, we find the Master was correct in overruling Judge Bates' exceptions to the form of his notice of the proceedings.

### Discovery

Rule 7 directs the Master "to proceed with the hearing as nearly as may be according to the rules of procedure governing the trial of civil causes in this state." Judge Bates complains of several rulings made by the Master concerning discovery.

■ On Oct. 4, 1976, the day the hearings were to begin, without previously having requested the taking of depositions, counsel for the Judge filed an application to delay the hearings and allow him to take depositions from thirteen persons. Initially, the Master granted this motion allowing the remainder of the week. The Master then changed his order and allowed only 3 depositions of counsel's choosing. We have been shown no abuse of discretion in this decision.

Judge Bates made no request for discovery prior to the first day of the hearing. The Judge made no showing why he needed to depose each of these persons and thereby delay the hearing for late discovery. Judge Bates requested subpoenas be issued to the same persons, ordering them to appear and to bring requested documents. The Master agreed to subpoena, or require the attendance of all persons requested, and to require that all requested documents be presented to the Court.

This deposition list was composed almost exclusively of members, or past members, of the District Attorney's staff and of police officers, many of whom possessed the same familiarity with the facts of the investigation. Counsel had adequate opportunity for discovery prior to the first day of the hearing. Counsel for the Judge had talked with most of these same people previously in connection with the criminal trial and agreed that it was probably not necessary to depose them all.

Judge Bates complains about a ruling by the Master that certain documents, produced by Detective Baker in connection with his deposition, constitute work products of the District Attorney's office, and were therefore not discoverable. The documents were final investigative reports prepared on the day following the Judge's arrest by the detectives assigned to this case and submitted to their supervisor.

■ The Harris County District Attorney's office was requested by the Judicial Qualifications Commission to assist in investigating and presenting the case against Judge Bates. Judge Bates contends this document is not covered by Texas Rules of Civil Procedure 186a since it speaks of happenings during the period prior to the arrest. The report was, however, prepared subsequent to the arrest. It was ordered sealed and the contents were never considered by the Master or anybody reviewing the evidence against Judge Bates. The Master has followed the Rules of Civil Procedure "as nearly as may be" and accomplished the purpose of Rule 186a of the Texas Rules of Civil Procedure. Contrary

to his contention, Judge Bates has not been prevented from knowing, and refuting, the evidence against him since this report has never been relied on in evaluating the evidence in this case.

 Finally, the Judge contends that the identity of an "informer" should have been revealed to him. The "informer" was the person who early in the investigation told the Police Department that Nukie Fontenot might be negotiating a bribe with Judge Bates. That is the only part which the "informer" played in this affair, and we agree with the Master that the identity is not relevant because the charges here are based on the events that transpired thereafter. The informer was not a participant in the alleged offense, and his information was not necessary to establish probable cause for the arrest of Judge Bates. The role of the informer was very minor and occurred quite early in the investigation; and absent other evidence concerning the relevance of the identity of the informer, the disclosure is not required. *Roviaro v. U. S.,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *U. S. v. Freund,* 525 F.2d 873 (5 Cir. 1976).

## EVIDENTIARY CHALLENGES

Both the Master and the Commission found that Judge Garth Bates did accept a benefit, money, ". . . on the representation or understanding that he . . would be influenced in the specific exercise of his official discretion as a District Judge . . ." Both the Master and the Commission then concluded that such conduct was willful and persistent, that such conduct was clearly inconsistent with the proper performance of his duties as a District Judge and was clearly of a nature to cast discredit upon the judiciary.

Judge Bates contends that the *legally admissible evidence* against him amounts to no more than a mere scintilla and does not support the findings of the Commission. He objects to the admission of the following evidence offered by the Examiner on behalf

of the Commission: tape recorded conversations between Nukie Fontenot and Ed J. Riklin, tape recorded conversations between Nukie Fontenot and Judge Bates, and all xerox copies of hundred dollar bills.

We now address the objections of Judge Bates to the admission of the tape recordings, and then the matter of the xeroxed copies of the bills.

## TAPE RECORDINGS

Rule 9 states that in hearings before the Master and before the Commission only legal evidence shall be admitted, such as would be received at a civil trial. Judge Bates makes a number of challenges to the Master's order permitting the admission into evidence of tapes of telephone conversations between Nukie Fontenot, a police informer, and himself, Judge Bates. He also objects to the admission of taped telephone conversations between Fontenot and Ed Riklin, the Judge's friend.

### Tapes—Privacy

He first contends that the tape recordings of conversations between Fontenot and himself were obtained in violation of his rights to be free from unexpected, unauthorized intrusions into his privacy protected by the 4th and 14th Amendments of the United States Constitution.

 This is not a criminal proceeding,[8] nor does this case involve illegal wiretapping; and thus, the cases cited to us by Judge Bates are distinguishable. The police did not tap Judge Bates' telephone. Nukie Fontenot, independent of police assistance, made the tapes of his own conversations with Judge Bates. Fontenot testified as to the content of these conversations, and the tapes were played to bolster the credibility of the testimony. Judge Bates willingly had these conversations with Fontenot who then later revealed the contents. He expected Fontenot to hear and know the contents. Judge Bates cannot complain when Fontenot later revealed the contents.

**8.** *In re Brown,* 512 S.W.2d 317 (Tex.1974).

Judge Bates relies on *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Katz*, the Court held that information obtained by electronic surveillance is inadmissible under the Fourth Amendment where government agents obtain such information by intrusion into an area where a person justifiably expects his privacy. The United States Supreme Court has written on this subject since *Katz*. In *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Court held that there was no unlawful intrusion when a party to a conversation then or later reveals the conversation to the police. However strongly a defendant trusts an apparent colleague, his expectations in this regard are not protected by the Fourth Amendment. 401 U.S. at 749, 91 S.Ct. 1122.

The Court in *White, supra,* quoted from *Hoffa v. United States,* as follows:

"In these circumstances, 'no interest legitimately protected by the Fourth Amendment is involved,' for that Amendment affords no protection to 'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.' " 385 U.S. 293, 302, 87 S.Ct. 408, 413, 17 L.Ed.2d 374 (1966).

### Tapes—Federal Acts

Judge Bates next objects to the admission of all the tape recordings because, he contends, they were obtained in violation of the Communications Act of 1934, 47 U.S.C.A. § 605, and the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. § 2510 *et seq.* We find no merit in this contention.

Both statutes would prohibit the use of taped telephone conversations as evidence in state or federal courts unless the person taping the conversation is a party to the communication, or *one of the parties to the conversation* has given prior consent to such

interception.[9] *Lee v. State of Florida,* 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968). Fontenot had consented to the taping of the conversations.

Fontenot, the Judge contends, recorded his conversations with Riklin, and his conversations with Judge Bates, because the District Attorney's office had promised him leniency in regard to the prosecution of the indictments, which were pending against him. The consent, he contends, induced by a promise of leniency was, therefore, not voluntary. So, he contends, the taped conversations are inadmissible as evidence. *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *Laughlin v. United States,* 120 U.S.App. D.C. 93, 344 F.2d 187 (1965), and *Weiss v. United States,* 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939) are cited.

The record supports, at most, an implied promise of leniency by the District Attorney in regard to indictments pending against Nukie Fontenot. Judge Bates does not contend that Fontenot was coerced or threatened, but the Judge erroneously contends that a promise of leniency makes Fontenot's consent involuntary. We will first examine the cases cited by the Judge; then we will discuss a few cases not cited by the Judge.

In *Rathbun v. United States, supra,* one party to a conversation requested police officers to listen in on an extension phone in his house. The Court stated that each party to a telephone conversation takes the risk that the other party may have an extension telephone and may allow another to overhear the conversation. It is conceded that either party to a conversation may record it and publish it for his own benefit. The issue of voluntary consent was not present in *Rathbun, supra.*

In *Weiss v. United States, supra,* government officials wiretapped defendant's phones without the consent of *any* party to

9. Section 2511 of Title 18, U.S.C.A. provides in part:
 "(2)(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication *or one of the parties to the communication has given prior consent to such interception.*" [emphasis ours]

the conversations. Later upon being confronted with this evidence, several defendants decided to plead guilty and become a witness for the government. These witnesses at this later time then agreed the tapes could be used. The Court found that one party must consent to the taping of conversations *at the time* of its interception. The Judge does not suggest that Fontenot did not give *prior* consent. We find *Laughlin v. United States, supra,* to be similarly distinguishable.

We have found an abundance of case law regarding this specific question of voluntary consent. The Federal Circuit Courts and others have uniformly held that a promise of leniency as to pending indictments does not constitute coercion so that a consent becomes involuntary. *U. S. v. Bastone,* 526 F.2d 971 (7th Cir. 1976); *U. S. v. Franks,* 511 F.2d 25 (6th Cir. 1975); *United States v. Dowdy,* 479 F.2d 213 (4th Cir. 1973); *United States v. Osser,* 483 F.2d 727 (3rd Cir. 1973); *United States v. Silva,* 449 F.2d 145 (1st Cir. 1971); *United States v. Jones,* 140 U.S.App.D.C. 70, 433 F.2d 1176 (D.C.Cir. 1970); *Black v. United States,* 341 F.2d 583 (9th Cir. 1965); *Torry v. Montayne,* 404 F.Supp. 1397, 1400 (W.D.N.Y. 1975); *U. S. v. Slawik,* 408 F.Supp. 190 (D.Del. 1976).

Robert C. Bennett, Jr., Chief of Special Crimes Divisions, in charge of the investigation of Judge Bates, testified that no representations were made to Nukie Fontenot regarding any disposition of the cases pending against him. He also testified, "I think it would be fair for him to assume he wouldn't go to the pen for as long as he would if he did not cooperate." Judge Bates introduced tape recordings of the conversation that occurred between Nukie Fontenot and Detectives Musick and Nuccia when they confronted him initially concerning their "tip off" as to the bribe. No particular promises of leniency were made to Fontenot by the office of the D.A., although there's an implied promise to "help him." Nukie Fontenot testified under strenuous cross examination that he had

consented to tape the conversations and to turn over all these tapes. He further testified that "no deal had been cut." As stated above, such an inducement did not make his consent involuntary. We overrule this objection to the admission of all the tapes.

### Tapes—Proper Predicate

■ Judge Bates next contends that a proper predicate such as required in *Cummings v. Jess Edwards,* 445 S.W.2d 767, 773 (Tex.Civ.App.—Corpus Christi, 1969 err. ref'd n. r. e.), was not established for the admission of the tapes. Judge Bates did not, however, complain of any specific omissions in the predicate; and specific objections are required. *Drake v. State,* 488 S.W.2d 534 (Tex.Civ.App.—Dallas, 1972, ref'd n. r. e.).

In *Drake v. State,* a disciplinary proceeding resulting in the disbarment of an attorney, similar contentions regarding proper foundation were raised; and the court indicated that specific objections, not general objections, to proper predicate are required. The court in *Drake, supra,* further stated that the admissibility of evidence rests largely within the discretion of the court.[10]

■ Nukie Fontenot identified the equipment employed in making the tapes. One of the recorders, a cassette recorder, was present in the court room and used before the Master to play and record these tapes. Fontenot also used a reel-to-reel recorder set-up in his office. Fontenot gave testimony regarding the circumstances surrounding the making of each tape. He testified that he sold such equipment and was quite familiar with its use. He identified the voices on each tape, and he testified as to the authenticity of each tape and to his consent. The chain of custody of the tapes was established by testimony from Fontenot and Detective Don Baker, in whose possession they remained from the time of making until the hearing. Fontenot listened to the tapes after he made them; he also listened to them at Special Crimes Division the week before the hearing.

10. *See also Schwartz v. State,* 158 Tex.Cr.R. 171, 246 S.W.2d 174 (1952).

Judge Bates had been in possession of copies of these tapes prior to the hearing. A proper predicate has been established.

### Tapes—Hearsay

■ Judge Bates contends next that the conversations between Nukie Fontenot and Ed Riklin are hearsay as to him and should not have been admitted. He concedes that an exception to the hearsay rule is applicable if the evidence, independent of these hearsay tapes, establishes the existence of a conspiracy. It has long been the rule in Texas in criminal as well as civil cases that in order to establish a conspiracy for evidentiary purposes there must be evidence apart from the hearsay statements which establishes *prima facie* the existence of a conspiracy. This rule is in line with the rule in a majority of the states. *Walter Heller and Co. v. Barnes,* 412 S.W.2d 747, 757 (Tex.Civ.App. El Paso, 1967, writ ref'd n. r. e.); *Amberson v. Wilkerson,* 285 S.W.2d 420 (Tex.Civ.App.—Austin, 1956, no writ); *Johnson v. Lagow,* 14 S.W.2d 818 (Comm.App.1929, jdgmt. adopted); *Rowley v. Braly,* 286 S.W. 241, 246 (Tex.Civ.App. Amarillo, 1926, writ dismissed); *Chapman v. State,* 470 S.W.2d 656, 662 (Tex.Cr.App. 1971); *Clark v. State,* 158 Tex.Cr.R. 231, 254 S.W.2d 527; Note, 11 T.L.R. 390 (1933); 31A C.J.S. Evidence § 362 (1964).

■ The evidence apart from the conversations between Riklin and Fontenot is overwhelmingly in support of a theory of conspiracy, and it is within the discretion of the Master to determine the order in which the evidence is to be presented. *Walter Heller and Co., supra.*

In addition to testimony of various witnesses, tapes of three conversations between Judge Bates and Fontenot were introduced.

On June 8, 1975, Fontenot called Judge Bates at his court and recorded the conversation. Judge Bates instructed Fontenot to talk with Ed Riklin, that Judge Bates trusted Riklin; Riklin was his friend and the Judge couldn't talk with Fontenot. On July 18, 1975, Fontenot called Ed Riklin's apartment and talked with Judge Bates who identified himself as a friend from out of town. Detectives from the District Attorney's office made pictures of Judge Bates at Riklin's apartment that evening, and Fontenot identified the voice from previous conversations with the Judge in court. James Brown, Judge Bates' accountant, and other court employees testified that the Judge and Riklin were close friends and were often together.

On July 16, 1976, Judge Bates followed Riklin to the bank to pick up the money. James Brown, who was requested by the Judge to come along to the Bank, testified that the Judge pointed out to him Fontenot's place of business as they passed it, and the Judge identified the owner of the place as being the person paying Riklin the money. He also told Brown to keep his eye on the truck [Fontenot] which was parked in front of the place. James Brown also testified that after Riklin picked up the money, Brown, Riklin, and Judge Bates returned to Brown's office and there Riklin handed Brown $10,000 out of the brief case at Judge Bates' request. Judge Bates instructed Brown to purchase a cashier's check and then deliver the money as earnest money on a business deal in which Judge Bates was involved. Later on July 16th, Fontenot called Judge Bates at home and recorded the conversation. The Judge told Fontenot in this conversation that "He was doing it for Riklin," and later in the conversation the Judge said he would "help Fontenot." He also told Fontenot he didn't need an attorney and that Fontenot should talk with Riklin and do as Riklin says. $30,000 of the $100.00 bills were found in Riklin's apartment. We find this evidence is sufficient to establish a *prima facie* showing of conspiracy.

### Tapes—Right of Confrontation

In the final contention of error regarding admission of the tapes, Judge Bates argues that admission of tapes of *Ed Riklin's* conversations with Fontenot and the court's refusal to disclose the identity of the informer had the effect of denying him his right to confront his accusers and cross-examine the witnesses against him.

The Rules for Retirement and Removal of Judges, *Rule 10(a) Procedural Rights of Judges,* guarantees to the judge the right of confrontation of accusers and the right to cross-examine witnesses. The Commission has denied neither right to Judge Bates.

The Judge contends he was not able to cross-examine Ed Riklin because Riklin would have claimed his privilege under the Fifth Amendment, if called to testify. Riklin has also been indicted for the criminal act of bribery arising out of these facts. Mr. Michael Ramsey, attorney for Ed Riklin in his criminal case was called to testify that Riklin would invoke the provisions of the Fifth Amendment of the United States Constitution and refuse to testify. This is a unique argument. The Commission has not refused to allow cross-examination or confrontation of witnesses. The statements by Riklin were made in furtherance of a conspiracy and are clearly admissible.

Judge Bates cites two cases, *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), and *States Marine Lines Inc. v. Federal Maritime Commission,* 126 U.S.App.D.C. 187, 376 F.2d 230 (1967) as supportive of his contentions. We regard them as distinguishable. In both cases, the government agency based its decision pertaining to the defendants on evidence consisting of testimony taken from witnesses whose identity the government refused to disclose to the accused party. In neither case was the accused party even told of the substance of the testimony and as a consequence, the accused had no knowledge of the evidence against him. Such is not the case here.

## XEROX COPIES OF $100 BILLS

In order to obtain the money needed for the bribe, the District Attorney's office arranged for a $60,000.00 loan from a local bank. The money was picked up by Detectives Baker and Bennett on the morning of July 16, 1976. It was then xeroxed at the Division Office by Detective Baker so that there would be a record of the serial numbers. It was then delivered to Northwest Bank and placed in Nukie Fontenot's safety deposit box. As this money was recovered from various sources, such as from the Dickerson State Bank, Judge Bates, Ed Riklin, etc., the serial numbers were compared to the xerox copies of the original $60,000. The money recovered was then xeroxed and the original money returned to the lending bank. Detective Baker had custody of the xerox copies at all times and he had custody of the original cash before the bribe and as it was recovered. He returned it to the bank.

### Xerox Copies—Illegal Search

Judge Bates first contests the admission of the xerox copies of the 29 hundred-dollar bills found in his coat pocket after his arrest. He contends the money was found as a result of an illegal search incident to an illegal arrest. Judge Bates was arrested without a warrant at the scene of the arrest of Ed Riklin. In the early afternoon of July 16, 1976, immediately following the arrest of Ed Riklin, and while the police and Riklin were still standing in the street in front of his apartment, Judge Bates drove up in front of the apartment in his car. He was within twenty-five yards of the arresting group when he stopped his car and began backing away. At that moment, Detective Musick saw him and ran toward the car, holding up his badge and ordering the Judge to stop. Judge Bates stopped, turned off his car and stepped out. A few minutes later he asked Detective Musick to look into the pocket of his coat, which was lying on the front seat, and get the car keys. Detective Musick did not find the keys, but found instead, 29 one-hundred dollar bills.

The Master overruled this objection in the hearing, and stated in his findings that the money was found, not as a result of a search, but as a result of a request from Judge Bates. We agree that there was no "search," and even if there were a search, the money is admissible under the "plain view" doctrine.

Judge Bates contends that the constitutional exclusionary rule which would exclude evidence obtained by an illegal search is applicable to civil cases, but cites in support, two United States Supreme Court cases which hold that "forfeiture proceedings", although civil in form, are essentially criminal or quasi-criminal in so far as the application of the exclusionary rule is concerned. *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *One 1963 Chevrolet Pickup Truck v. Commonwealth,* 208 Va. 506, 158 S.E.2d 755 (1968). We have stated that these proceedings are civil in nature. *In re Brown, supra.* We reserve the question as to whether these proceedings might be quasi-criminal for the purposes of application of the exclusionary rule of the 4th and 14th Amendment of the United States Constitution. We find the evidence complained of admissible in any case.

In a recent case from the Texas Court of Criminal Appeals, *Craig v. State,* 533 S.W.2d 827 (Tex.Cr.App.1976), the Court, quoting from *Haerr v. United States,* 240 F.2d 533 (5th Cir.1957), stated that, "Mere observation does not constitute a search. A search implies an examination of one's premises or person with a view to the discovery of contraband and or evidence of guilt to be used in prosecution of a criminal action. The term implies exploration investigation or question." [11] In *Craig,* a party who was under arrest asked the police officer making the arrest to get a brief case containing some valuables out of his truck. Following this request, the officer accidentally observed a gun lying in plain view on the floor of the truck. The requesting party voluntarily requested this action as did Judge Bates in this case.

The "plain view" doctrine articulated in *Coolidge v. New Hampshire,* 403 U.S. 443, 466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), would exempt the seizure of this money

even if there has been a "search." If an officer has *prior justification* for an intrusion and in the course of this intrusion, he inadvertently comes across a piece of evidence incriminating to the accused, then the evidence is admissible under the "plain view" doctrine. *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Harris v. U. S.,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *Ker v. Calif.,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

In this case the *justification* for Detective Musick's presence was Judge Bates' request that the Detective check the Judge's coat pockets for the car keys.

In addition to the above, we are certain that the search if there were a search, could be justified as a search incident to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Probable cause is necessary to arrest a person without a warrant and the standard is no less stringent than that needed to obtain a warrant. *Whiteley v. Warden,* 401 U.S. 560, 565, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

Facts and circumstances within the knowledge of Detective Musick at the time of the arrest of Judge Bates were sufficient in themselves to warrant a man of reasonable caution in the belief that Riklin and Judge Bates were involved in a conspiracy to commit bribery. *Carroll v. U. S.,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Ker v. Calif., supra.* Detective Musick had listened to *all* tapes, or had knowledge of their contents. He had observed Judge Bates at the Northwest Mall with Riklin that morning and had lost the threesome when he attempted to follow. He had seen Riklin with the same briefcase which he observed at the Mall. Only a few minutes after he had participated in Riklin's arrest he then observed Judge Bates at-

[11]. *See also Mancusi v. DeForte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *Blassingame v. Estelle,* 508 F.2d 668 (5th Cir. 1975); *U. S. v. Williams,* 446 F.2d 486 (5th Cir. 1971); *Turner v. State,* 499 S.W.2d 182 (Tex.Cr. App.1973); 79 C.J.S. Search and Seizures, § 1 (1952).

tempting to leave the scene after Judge Bates must have observed the arrest of Riklin.

We find no theory upon which the money obtained from Judge Bates upon his arrest was obtained in violation of his 4th and 14th Amendment privileges.

### Xerox Copies—Best Evidence

In his final contest regarding the legality of evidence in this case, Judge Bates contends the xeroxed copies of the hundred dollar bills was inadmissible because the copies do not constitute the best evidence available. He does not contend that the xeroxed copies are incorrect but complains only that there is better evidence available. The originals of the hundred dollar bills were returned to the loaning institution and apparently have been returned to circulation.

Article 3731c,[12] permits the admission of these xeroxed copies if the original was produced, or "reasonably accounted for," or there is no bona fide dispute as to the accuracy of the reproduction.

We find no dispute at all as to the accuracy of these reproductions, and further it appears that the originals have been reasonably accounted for. The Examiner carefully traced the chain of custody as to these bills. The policy reasons behind the "best evidence" rule are satisfied; the secondary evidence here is of equal probative value as the originals, there is no reasonable fear of fraud, and keeping the originals from circulation and causing a State agency to pay interest is a reasonable excuse for their absence.[13]

### Evidentiary Challenges—Summary

We overrule all contentions regarding improper admission of evidence, and accordingly we overrule Judge Bates' objections that there is no legally admissible evidence supportive of the Commission's recommendation. We also overrule Judge Bates' objection that there is insufficient evidence to support the recommendation.

## CONCLUSION

As this Court held in *In re Brown, supra,*[14] the burden of establishing the charges against Judge Bates is by a preponderance of the evidence. We so find upon our evaluation of the evidence.

After careful consideration of all complaints lodged by Judge Bates, we find that he has engaged in conduct which was clearly inconsistent with the performance of his duties and casts discredit upon the judiciary and the administration of justice.

Accordingly, it is ordered that Judge Garth C. Bates be, and he is hereby, removed from the office of District Judge of the 174th Judicial District, this order to be effective at July 11, 1977.

In accordance with Rule 24 of Rules for Removal and Retirement of Judges, no motion for rehearing will be entertained.

SAM D. JOHNSON, J., concurs.

SAM D. JOHNSON, concurring.

This writer concurs in the result reached by the majority that Judge Bates be re-

---

12. Art. 3731c (Supp.) Photographic or photostatic copies of written instruments; use in judicial or administrative proceedings.

 Any copy or reproduction of a writing or written instrument, by photographic, photostatic, microfilm or other processes which accurately reproduces or forms a durable medium for reproducing the originals of any such writing or written instrument, can be used and its use shall be permitted in any judicial or administrative proceeding or trial, including the taking of depositions, where the party using the same, at the time of its offer in evidence either produces the original or reasonably accounts for its absence, or

where there is no bona fide dispute as to its being an accurate reproduction of the original. This Act shall be cumulative of any other statutory or common law relating to the subject hereof. Acts 1959, 56th Leg., p. 867, ch. 393 § 1.

13. *See Corrigan Properties Inc. v. City of West University Place,* 430 S.W.2d 917 (Tex.Civ.App. —Houston [1st Dist.], 1968 no writ); *Schweitzer v. Standard Coffee Service Co.,* 521 S.W.2d 955 (Tex.Civ.App.—Waco, 1975, no writ).

14. 512 S.W.2d at 320.

moved from office. This writer does not agree, however, that the so-called "forgiveness doctrine" should be reserved for future consideration. The forgiveness doctrine is strongly urged by Judge Bates; it should be considered and it should be forthrightly rejected.

The majority accurately states that Article 5986 is not applicable to removal cases of this nature. Tex.Const. art. V, § 1–a. The forgiveness doctrine, a shield for judicial officers, was originated by this court as a judicial concept in *In re Laughlin,* 153 Tex. 183, 265 S.W.2d 805 (1954). In subsequent cases, *In re Brown,* 512 S.W.2d 317 (Tex.1974), and *Matter of Carrillo,* 542 S.W.2d 105 (Tex.1976), this court analyzed the doctrine and found it was not applicable. In each instance this court stated that even if the doctrine were applicable it would not alter the outcome. Likewise, in the instant case the majority states:

"We reserve for future consideration any application of the policy in cases of removal brought under Article V, Section 1–a, Tex.Const.

"Without holding that the legislative policy is also applicable to these proceedings under Article V, Section 1–a, this court has twice found (*Brown* and *Carrillo, supra*) that even if the policy announced in *In re Laughlin, supra,* were applicable, it would not affect the outcome of the case in question. The same is true here."

Judge Bates strongly urges the forgiveness doctrine here. It is the judgment of this writer that it is not only before the court for consideration, but also that the doctrine should be totally rejected.

The doctrine has been unequivocally rejected by the voters of Texas and by the Legislature. The enactment by the Legislature and the approval by the voters of Texas of Article V, Section 1–a, of the Texas Constitution reflects the considered judgment of the people that a commission consisting of justices of the courts of civil appeals, district court judges, licensed attorneys, and lay citizens would be the best body to ascertain the fitness of a member of the judiciary to continue to hold office.

Such a commission is designed so that it might dispose of disciplinary matters with reasonable expediency. It was created by the people for the purpose of conducting an in-depth analysis of the fitness of an individual to hold an office of public trust. The people entrusted the commission with the authority to recommend to the Texas Supreme Court that a sitting judge be removed from office. As noted in the commentary to Article 15, Section 6, of the Texas Constitution:

"The Supreme Court is . . . closely associated with the problems of administering justice, and is confronted daily by problems of judicial ethics which gives it the proper appreciation of the conduct of any judge accused of malfeasance in office . . . .."

The people have delegated to the Judicial Qualifications Commission and to the Texas Supreme Court the authority to remove a member of the judiciary. The people have not seen fit to restrict this delegation of authority by a doctrine of forgiveness. This court should not foster a doctrine contrary to the method formulated for the removal of judicial officers in the Constitution. Therefore, this court should unequivocally reject the doctrine of forgiveness with respect to the judiciary.